UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JOEL CARDENAS,

                              Petitioner,

        v.

TIM GARRETT, et al.,

                              Respondents.

Case No. 3:15-cv-00476-MMD-CLB

ORDER

I.      **SUMMARY**

        In 2011, Petitioner Joel Cardenas, a Nevada prisoner, was convicted by a jury of sexual assault and sentenced to life with the possibility of parole after a minimum of 10 years of imprisonment.[1] (ECF No. 45-72.) This matter is before this Court on Cardenas's Motion for Evidentiary Hearing (ECF No. 87), Respondents' Motion to Have Clerk Seal Previously Filed Document ("Motion to Seal") (ECF No. 91), and for disposition of the merits of the remaining grounds of Cardenas's First Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition") (ECF No. 39).[2] In the Petition, Cardenas alleges, among other things, in Ground 2 that he received ineffective assistance of trial counsel for failing to move to excuse Juror 11 for presumptive bias after the juror disclosed during trial that he was personally acquainted with the alleged victim. (ECF No. 39 at 17-19.)   For the reasons discussed below, the Court finds there is cause and prejudice sufficient to overcome the procedural default of the claim in Ground 2. The Court finds that trial counsel's failure to move to excuse Juror 11 for presumptive bias

---

[1]Cardenas initiated this habeas proceeding while he was incarcerated. (ECF No. 1.) According to the state corrections department's inmate locator page, Cardenas has since been released from custody.

[2]The Court previously dismissed Ground 6 as unexhausted. (ECF No. 56.)

1   constitutes ineffective assistance under *Strickland v. Washington,* 466 U.S. 668 (1984),

2   in violation of the Sixth and Fourteenth Amendments as alleged in Ground 2. Accordingly,

3   the Court grants the Motion to Seal, denies the Motion for Evidentiary Hearing, grants

4   Cardenas a writ of habeas corpus for Ground 2, denies all other grounds of the Petition

5   on the merits, grants a certificate of appealability for Grounds 1 and 4, vacates the

6   judgment, and reverses and remands for a new trial.

7   **II.   BACKGROUND[3]**

8        On the evening of July 31, 2007, Swedish emigrant Emma Sundstrom attended a

9   softball game in Pahrump, Nevada, where she consumed two to four beers. (ECF Nos.

10  92-13 at 43-44; 92-14 at 7.) After the game, she and her friend, Mike Murphy, went to

11  Champions and Terrible's Town Casino where she consumed several "mixed drinks," of

12  rum-and-coke, and "a couple of shots," of "liquid cocaine," i.e., "a mixture of Southern

13  Comfort, and pineapple juice, and amaretto." (ECF Nos. 92-13 at 44-47; 92-14 at 8-9, 11-

14  12.) Cardenas and his girlfriend joined them at Champions, where he and Sundstrom

15  played a set of pool. (ECF Nos. 92-13 at 45-47; 92-14 at 14.)

16       Sundstrom, Murphy, and another friend, Trisha Genet, left Champions for

17  Murphy's house where Sundstrom felt "too intoxicated" and went to sleep in a bedroom

18  that belonged to Murphy's roommate, Eric Estes, who was away at the time. (ECF Nos.

19  92-13 at 47-48; 92-14 at 13-14.) Sundstrom awoke to find Cardenas "performing oral sex"

20  on her with his tongue in her vagina. (ECF No. 92-13 at 49-50.) She passed out and

21  awoke to Cardenas penetrating her vagina with his fingers. (*Id.*) She "tried to tell him to

22  stop, to quit it," but he "just kept on, and finally he started having vaginal sex" with her

23  using his penis. (*Id.*) She "kept trying to get him off of [her]," and "tried to hit his chest."

24  (*Id.*) Her throat hurt, and she did not know whether he was "holding [her] down or if he bit

25

26        [3]The Court summarizes the relevant state-court record solely as background for
27  consideration of the issues in this case. The Court makes no credibility or factual findings
    regarding the truth or falsity of evidence or statements of fact in the state court. No
28  assertion of fact made in describing statements, testimony, or other evidence in the state
    court constitutes a finding by this Court. Failure to mention a specific piece of evidence
    or category of evidence does not signify the Court overlooked it in considering the issues.

[her]." (*Id.*) He told her his girlfriend was okay with it and wanted to have sex with her when he was done. (*Id.*) Sundstrom did not recall putting her clothes back on or Cardenas leaving the room. (*Id.*)

Michael Zelonis was staying at Murphy's house and awoke at 3:30 a.m., upon the arrival of Murphy, Sundstrom, Genet, and Cardenas and his girlfriend. (ECF No. 92-14 at 44-47.) Zelonis saw Sundstrom enter Estes's bedroom, and saw Cardenas later enter that same bedroom for 15 minutes. (*Id.* at 57-61.) Zelonis was in an adjacent bathroom while Cardenas was in the bedroom with Sundstrom, and heard Sundstrom say three times, "No, stop, quit." (*Id.* at 48.) Zelonis opened the bathroom door, allowing it to hit the wall that adjoined Estes's bedroom, "to try to startle, you know, make [Cardenas] know that [Zelonis] was there." (*Id.* at 49.) Zelonis called out asking Sundstrom if she was okay, and then went outside to inform Murphy, "because it was his home," and "he needs to know if something wasn't going on right in his house." (*Id.*) Zelonis said Cardenas exited the house right behind him and gave him an angry look. (*Id.* at 51.) Afterward, Zelonis saw Sundstrom sitting on the couch "holding herself," and observed that "she just didn't look right." (*Id.* at 52.) Zelonis said Genet drove him to work, accompanied by Murphy and Sundstrom, and that Sundstrom "was pretty much crying the whole time," "didn't want to be alone," but didn't say anything. (*Id.* at 65-67.)

Michael Murphy testified that when they arrived at his house that night, he and Genet went directly to his room. (ECF No. 92-14 at 87.) When Genet was ready to leave, he walked her to her car, and saw Cardenas's girlfriend passed-out on the bathroom floor. (*Id.* at 87-88.) Genet's tire was flat, so they changed it; and while doing so, Murphy saw Cardenas walk out of the house with his girlfriend over his shoulder and place her in Cardenas's vehicle. (*Id.*) Murphy said Cardenas walked back inside the house and emerged about 10 to 15 minutes later and walked "dead on to his car." (*Id.*) Murphy claimed he, not Genet, drove Zelonis to work and that Sundstrom asked him if she could go with them. (*Id.* at 89.) After dropping Zelonis off, Murphy asked Sundstrom if she was okay and she replied, "I'm okay" but Murphy said he could tell she was not okay because

she used a "high-pitched voice as if she was trying to hold tears back or something or she was about to break out crying," and she did not want to be alone. (*Id.* at 89-90.) He described her demeanor as "just dead silent and like pale-like and sort of kept to herself." (*Id.*) Murphy said he knew something was wrong but didn't want to pry it out of her. (*Id.*)

Cardenas admitted he consumed marijuana twice and 15 or more beers that night. (ECF Nos. 92-15 at 16, 23, 50, 52; 92-16 at 1, 16.) At Champions, he believed he and Sundstrom were "a little bit rubbing up against each other and flirting" during a game of pool. (ECF No. 92-15 at 29.) He also believed Sundstrom, and his girlfriend, were flirting with each other and that they might be interested in "a little 'menage a trois,'" or permit him to watch them "have their own little thing." (ECF Nos. 92-15 at 28-29; 92-16 at 54.) He claimed that on a previous occasion at Paddy's Pub, he, Sundstrom, and another girl, danced together "kind of like dirty dancing type, just kind of grinding up on each other," where they would "just kind of kiss each other on the ear, a little nibble," and were "basically rubbing on each other." (ECF No. 92-16 at 11-12.)

When they left Champions for Murphy's house, Sundstrom rode with Cardenas and his girlfriend. (ECF No. 92-15 at 25, 29.) Cardenas believed he and Sundstrom were flirting with each other in the car by "making little innuendos here about, you know, sexual activities." (*Id.* at 38.) He claimed he asked Sundstrom, "What do you think about having a little private party between you, [my girlfriend], and myself," and Sundstrom replied, "It might be possible. We'll see what happens." (ECF Nos. 92-15 at 38; 92-16 at 55-56.)

At Murphy's house, Cardenas went to the bedroom where Sundstrom was asleep and asked her whether she was "still interested in having a little private party?" (ECF No. 92-15 at 38-39.) He claimed she told him "to come over close to her," "pulled" him down, they "started kissing and touching each other," and that she "grabbed" his "crotch" and "got on top of him," and rubbed her vagina on his penis, but he was unable to achieve an erection. (ECF Nos. 92-15 at 39-42; 92-16 at 63.) He denied putting his finger in her vagina but admitted performing cunnilingus. (ECF No. 92-15 at 42-43.) He left because she put her hand on his scrotum and "tried to put a finger" in his anus. (*Id.*) Cardenas

4

denied Sundstrom hit him in the chest, told him "no," and tried to get him off of her. (ECF No. 92-16 at 69-70.)

Sundstrom delayed her report to the sheriff until August 6, 2007, as she wanted to wait until a friend arrived from Sweden. (ECF Nos. 92-13 at 52-55; 92-14 at 40-41.) The sheriff photographed a bite mark on Sundstrom's right shoulder and bruising and swelling on her neck, but it was too late for a rape kit. (ECF Nos. 92-13 at 55-56; 92-14 at 1.) Sundstrom later passed a polygraph during which she was asked if she recalled lying about sexual activity, and she replied, "I've never lie (sic)." (ECF No. 92-14 at 3-4.)

Las Vegas Metropolitan Police Department ("Metro") officer and polygraph examiner Jack Clark testified he administered a polygraph to Cardenas during which Cardenas "was very adamant" that "there was no sexual contact" or penetration with Sundstrom. (ECF No. 92-16 at 125, 127.) Clark said the test results, however, indicated "deception" in Cardenas's responses to questions. (*Id.* at 126.) After Clark explained the results to Cardenas, Cardenas disclosed that Sundstrom "was fondling him and kept asking where his girlfriend was," that he performed cunnilingus on Sundstrom, and that Sundstrom got on top of him and rubbed her vagina on his penis. (*Id.* at 126-27.)[4] Deputy Morgan Dillon of the Nye County Sheriff's Office testified Cardenas told him he did not think he sexually penetrated Sundstrom but "could not remember for sure." (*Id.* at 135.) At trial, Cardenas admitted he failed to initially tell the police that he performed cunnilingus on Sundstrom, that she rubbed her vagina on his penis, and that she tried to penetrate his anus. (ECF No. 92-16 at 75-83.) He admitted he later told these things to the polygrapher after the polygrapher informed him that the polygraph results indicated he was deceptive in his responses to questions about whether he and Sundstrom had sexual contact. (*Id.*)

Michael Shawn Levy, a physician specializing in addiction medicine, could offer no expert opinion about the intoxication of Cardenas or Sundstrom because he did not

---

[4]The pages of Officer Clark's testimony are out of order in the exhibit filed with this Court. (ECF No. 92-16 at 126-27.)

examine or speak with either of them. (ECF No. 92-16 at 30-31.) Levy agreed consumption of two bowls of marijuana and 15 beers may cause an individual to "completely misinterpret" social cues. (*Id.* at 36-37.) He said studies concerning the apparent functioning of individuals under the influence of high levels of alcohol are paradoxical: "There are individuals who can function and appear normal under high levels of alcohol, and there are some who do not," and it is "unpredictable" "who can function at a relatively normal level versus who can't." (*Id.* at 37-39.) The impact of high doses of alcohol over a relatively short period of time on memory also varies. (*Id.* at 25.) It can cause episodes of impaired memory, commonly called "black outs," which may be short and fragmentary or significant and last for hours, or even days. (*Id.*) All things being equal, alcohol metabolizes at about one to two drinks per hour except that women metabolize alcohol slower than men. (*Id.* at 29, 34-35, 38.)

Sundstrom testified in rebuttal that she did not rub against Cardenas during a pool game at Champions. (ECF No. 92-16 at 137.) Samantha Jacquez testified in rebuttal that she and Sundstrom left a previous party at Murphy's house after they first encountered Cardenas because he made "sexual comments," that made them uncomfortable. (*Id.* at 107.) Jacquez agreed that she and Sundstrom had previously encountered Cardenas at Paddy's Pub, where she said he "came out and tried to dance with us, grabbing us and, 'Oh, come on, girls,' and putting his arms around us," but she said they "weren't interested." (*Id.* at. 107-08.) When they started to leave, Cardenas "grabbed" Sundstrom "by the arm and said, 'Come on, baby, you know that you're interested,'" and tried to kiss her," but Jacquez told him, "She's not interested," and they left. (*Id.* at 108.) Jacquez denied Sundstrom was "dirty dancing" with Cardenas. (*Id.* at 109.)

## III.    GOVERNING LEGAL STANDARDS

### A.    Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

If a state court has adjudicated a habeas corpus claim on its merits, a federal court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established [f]ederal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 409-10, 412) (internal citation omitted). State courts are not required to be aware of or cite Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the

standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted). The petitioner has the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

## B.    Standards for Evaluating Ineffective Assistance of Counsel ("IAC")

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). An IAC claim requires a petitioner to demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen*, 563 U.S. at 189. Petitioners bear the burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

Petitioners making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. When considering an IAC claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. In considering IAC claims, a court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide

range of professionally competent assistance." *Id.* at 690. For deficient performance, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *See id.* at 689-90. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Although IAC claims are examined separately to determine whether counsel was deficient, "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *Harrington*, 562 U.S. at 105 (internal citations omitted). *See also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

### C.    Standard for Evaluating Procedurally Defaulted Claims

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). Where a petitioner fails to do so and therefore "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will

result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

For claims of ineffective assistance of trial counsel, petitioners may overcome procedural default of the claim where (1) the claim of ineffective assistance of trial counsel is a "substantial" claim; (2) the "cause" consists of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."[5] *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012)). An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

"[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017-18 (9th Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a showing that the [trial counsel IAC] claim is 'substantial.'")). While review of trial counsel's actions in a *Martinez* prejudice analysis is conducted under a more relaxed standard, the *Strickland* standard is applied with full force when considering the actions of initial postconviction review counsel for a *Martinez* cause analysis. *See Leeds*, 75 F.4th at 1022. The requirements of cause and prejudice are distinct but, "[t]he analysis of whether both cause and prejudice are established under *Martinez* will necessarily overlap," as

---

[5]Nevada prisoners are required to raise IAC claims involving trial counsel in an initial state postconviction petition, which is the initial collateral review proceeding for purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

1    "each considers the strength and validity of the underlying ineffective assistance claim.'"

2    *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). On all such issues, if reached, the

3    Court's review is de novo. *See, e.g.*, *Detrich v. Ryan*, 740 F.3d 1237, 1246-48 (9th Cir.

4    2013); *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017).

5    **IV.   DISCUSSION**

6         **A.    Ground 1—IAC for Failure to Communicate Plea Offer**

7         Cardenas alleges trial counsel provided ineffective assistance in violation of the

8    Sixth and Fourteenth Amendments by failing to communicate a plea offer that Cardenas

9    would have accepted had trial counsel presented it to him. (ECF No. 39 at 12-17.)

10   Cardenas argues (1) Respondents forfeited their defenses of exhaustion and procedural

11   default; (2) even if the defenses are not forfeited or waived, the claim is technically

12   exhausted by procedural default; (3) this Court may consider as part of its *Martinez*

13   analysis Cardenas's declaration (ECF No. 40-7), the alleged plea offer (ECF No. 40-4),

14   and grant his motion for an evidentiary hearing (ECF No. 87); and (4) he can overcome

15   the procedural default with or without the declaration, alleged plea offer, or evidentiary

16   hearing. (ECF Nos. 85 at 11-15; 87.)

17        Respondents contend (1) Ground 1 should be dismissed as unexhausted because

18   it was not fairly presented to the state courts, or alternatively procedurally defaulted; (2)

19   the Court may not entertain Cardenas's declaration and alleged plea offer because they

20   were submitted to the state court during proceedings in which the state courts did not

21   consider them; (3) *Shinn* prohibits this Court from granting the Motion for Evidentiary

22   Hearing because Cardenas was not diligent in developing the factual basis for the claim

23   in state court and cannot meet the criteria of 28 U.S.C. § 2254(e)(2); and (4) Cardenas

24   cannot overcome the default under *Martinez* because the claim is insubstantial or lacks

25   merit. (ECF Nos. 78 at 8-12; 88.)

26        For the reasons discussed below, the Court dismisses Ground 1 because (1)

27   Respondents did not waive or forfeit their procedural defenses; (2) this Court is prohibited

28   from holding an evidentiary hearing or considering Cardenas's declaration or the alleged

plea offer for its *Martinez* analysis or for any other purpose because Cardenas is at fault for failing to develop the factual basis to support the defaulted claim in the state court proceedings; (3) Cardenas must, but cannot, meet the criteria under 28 U.S.C. § 2254(e)(2); and (4) Cardenas has not overcome the procedural default because his claim of ineffective assistance of trial counsel is wholly without factual support.[6]

### 1.    Applicable legal principles

The Supreme Court recognized in *Missouri v. Frye* that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012) ("When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires."). "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance," the petitioner must "demonstrate a reasonable probability [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel" and that "the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law." *Id.* at 147. "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012).

### 2.    Additional procedural background

Cardenas failed to appear for trial on the sexual assault charges on July 8, 2009. (ECF Nos. 44-7; 44-8; 44-9 at 5; 44-39 at 3-5.) A bench warrant was issued for his arrest,

---

[6]The Court declines to consider arguments and documents presented for the first time in the counseled reply brief. (ECF No. 85 at 5-8.) *See also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

1  and he was apprehended in March of 2010. (ECF Nos. 44-9 at 5; 44-39 at 3–5; 44-46 at

2  3; 92-7.) Cardenas was separately charged with felony Failure to Appear After Admission

3  to Bail. (ECF No. 44-47 at 5.) On May 25, 2010, the parties filed a fully executed guilty

4  plea agreement to resolve both cases, but the State rescinded the agreement before

5  Cardenas changed his pleas. (ECF Nos. 40-2; 40-3 at 3-4.) In March of 2011, a jury

6  convicted Cardenas of sexual assault. (ECF Nos. 45-72; 92-7.)

7                              **a.      Initial state postconviction proceedings**

8          In May of 2012, Cardenas filed motions for appointment of counsel to assist him in

9  his initial state postconviction proceedings and for an order directing his trial/appellate

10 counsel to deliver case records to him. (ECF Nos. 46-29; 46-30.) The next day, Cardenas

11 filed a *pro se* initial postconviction-review petition. (ECF No. 46-32.) The state district

12 court immediately ordered trial counsel to deliver the case file to Cardenas. (ECF No. 46-

13 34.)

14         Cardenas alleges that in June of 2012, he received his case records from counsel

15 and discovered a plea offer contained in them that trial counsel never communicated to

16 him. (ECF No. 39 at 15.) Cardenas did not, however, amend his *pro se* state petition to

17 claim, or in any way assert, during his initial *pro se* state postconviction review

18 proceeding, that counsel failed to convey a plea offer. The state district court denied the

19 motion for appointment of counsel and the *pro se* petition. (ECF Nos. 46-38; 46-40.) The

20 Supreme Court of Nevada reversed and remanded for appointment of counsel to assist

21 Cardenas for his initial state postconviction proceedings. (ECF No. 46-53.)

22         On remand, in December of 2013, Cardenas's appointed postconviction counsel,

23 after having met with Cardenas and reviewed case documents, filed a supplemental

24 points and authorities in support of Cardenas's *pro se* postconviction petition and

25 requested an evidentiary hearing. (ECF Nos. 46-57; 46-58; 47-10 at 8.) Cardenas's state

26 postconviction counsel did not in any way assert or present any documents to support a

27 claim that trial counsel was ineffective in failing to present a plea offer. (ECF No. 46-58.)

28 The state district court denied the petition in March of 2014. (ECF No. 47-2.)

1    In his opening brief on appeal from the denial of the initial pro se petition, Cardenas

2    asserted a claim that trial counsel did not inform him of a plea offer, and attached the

3    alleged plea offer to support the claim. (ECF Nos. 47-14 at 6, 23-26; 86-6 at 4; 86-7.)[7]

4    The state supreme court declined to consider the claim as it was not raised below:

5          [A]ppellant argues that counsel was ineffective for failing to inform him of an
           earlier, more favorable guilty plea offer. Because this claim was not raised
6          before the court below, we decline to consider it on appeal in the first
           instance. See Davis v. State, 107 Nev. 600, 606, 817 P.2d 1169, 1173
7          (1991).

8    (ECF No. 47-16 at 4.)

9                            **b.    *Pro se* federal petition**

10   Cardenas filed a *pro se* federal petition for writ of habeas corpus under 28 U.S.C.

11   § 2254, alleging in Ground "3g" that trial counsel was ineffective in failing to communicate

12   a plea offer but did not submit any exhibits to support the claim. (ECF No. 4 at 10.)

13   Respondents moved to dismiss Ground "3g" as procedurally defaulted and Cardenas did

14   not respond to the motion. (ECF No. 11 at 12-13.) This Court dismissed Ground "3g" with

15   prejudice as procedurally defaulted. (ECF No. 14 at 5-6.) The Court later ordered the

16   appointment of counsel to assist Cardenas with his federal petition. (ECF No 19.)

17                       **c.    Amended petition and motion to dismiss**

18   Cardenas's appointed counsel filed the operative First Amended Petition alleging

19   in Ground 1 that trial counsel was ineffective in failing to communicate an alleged plea

20   offer and submitted Cardenas's declaration and an alleged facsimile plea offer to support

21   the claim. (ECF Nos. 39 at 12-17; 40-4; 40-7.) A scheduling order instructed Respondents

22   to raise procedural defenses in a motion to dismiss and not in their answer, unless the

23   claims are clearly lacking merit, and failure to raise the defenses in the motion to dismiss

24   would subject them to potential waiver.[8] (ECF No. 25 at 2.) Respondents filed a motion

25          [7]The Court takes judicial notice of the publicly available docket and filings at the
26   Nevada Supreme Court's website, in which Cardenas's appendix in support of his appeal
     from the denial of the initial state postconviction review petition contains the alleged plea
27   offer.

28          [8]The Court's scheduling orders state in relevant part:

to dismiss the Petition but did not assert any defenses for Ground 1. (ECF No. 43.) The Court stayed proceedings pending exhaustion of claims in state court. (ECF No. 56.)

### d.  Second state postconviction-review petition

Cardenas's second state postconviction review petition, filed in May of 2019, claimed trial counsel was ineffective in failing to convey a plea offer and submitted Cardenas's declaration and the alleged facsimile plea offer to support the claim. (ECF Nos. 47-23 at 14-18; 65-8 at 197; 65-14 at 45-66.) The state district court dismissed the petition as successive and time-barred, finding there was no showing of good cause or prejudice. (ECF No. 65-2.) The Nevada Supreme Court affirmed the dismissal based on the application of the statutory bars in NRS § 34.726(1) and NRS §§ 34.810(1)(b)(2), (2). (ECF Nos. 65-7 at 38-43; 65-23 at 5.)

### e.  Renewed motion to dismiss the federal petition

Cardenas returned to federal court, the case was reopened, and this Court again issued a scheduling order instructing Respondents to raise procedural defenses in a motion to dismiss and not in their answer, unless the claims are clearly lacking merit, and warned that failure to raise the defenses in the motion to dismiss would subject them to potential waiver. (ECF Nos. 59; 60 at 2.) Respondents' renewed motion to dismiss did not include a motion to dismiss Ground 1. (ECF No. 63.)

---

> It is further ordered that any procedural defenses raised by Respondents to the counseled amended petition must be raised together in a single consolidated motion to dismiss. Procedural defenses omitted from such motion to dismiss will be subject to potential waiver. Respondents must not file a response in this case that consolidates their procedural defenses, if any, with their response on the merits, except pursuant to 28 U.S.C. § 2254(b)(2) as to any unexhausted claims clearly lacking merit. If Respondents do seek dismissal of unexhausted claims under § 2254(b)(2): (a) they must do so within the single motion to dismiss not in the answer; and (b) they must specifically direct their argument to the standard for dismissal under § 2254(b)(2) set forth in *Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005). In short, no procedural defenses, including exhaustion, should be included with the merits in an answer. All procedural defenses, including exhaustion, instead must be raised by motion to dismiss.

(ECF Nos. 25 at 2; 60 at 2.)

### 3.   Analysis of Ground 1

#### a.   Respondents' exhaustion and procedural default defenses

Respondents contend Ground 1 is either unexhausted because Cardenas failed to fairly present the claim, or alternatively procedurally defaulted. (ECF No. 78 at 8-12.) Cardenas contends Respondents forfeited their defenses because, contrary to this Court's scheduling orders, they failed without justification, to timely raise the defenses in either of their two motions to dismiss the operative Petition. (ECF No. 85 at 11-12.) The parties alternatively contend the claim is technically exhausted and procedurally defaulted. (*Id.*)

Cardenas is correct that Respondents did not assert any defenses to Ground 1 of the Petition in their motions to dismiss that Petition. (ECF Nos. 43; 63.) However, the defenses are neither forfeited nor waived because Respondents asserted the defenses in their answer to the Petition. (ECF No. 78 at 8-10.) "[T]he defense of procedural default should be raised in the first responsive pleading in order to avoid waiver." *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005). In *Morrison,* the Ninth Circuit Court of Appeals considered whether a procedural-default defense was waived because it was not raised in a motion to dismiss and was instead asserted in the answer. *See id.* at 1045-47. The Ninth Circuit concluded there was no waiver because such defenses must be raised in a responsive pleading, e.g., an answer, and a "motion to dismiss is not a responsive pleading within the meaning of the Federal Rules of Civil Procedure." *Id.* at 1047 (citing *United States v. Valdez*, 195 F.3d 544, 548 (9th Cir. 1999) *abrogated on other grounds by Dodd v. United States*, 545 U.S. 353 (2005)) (noting that failure to raise a procedural default defense in a motion to dismiss in the federal district court proceedings did not result in waiver of the defense on remand because "the government only filed a motion to dismiss, which was granted, and never filed an answer" to the habeas petition). *See also Randle v. Crawford*, 604 F.3d 1047, 1052-53 (9th Cir. 2010) (following *Morrison* and rejecting claims that a statute-of-limitations defense was waived

because it was not raised in the first motion to dismiss the habeas petition or in response to a later motion to reopen the case following a return to state court for exhaustion, because neither of those filings or potential filings constituted responsive pleadings under Rule 7(a) of the Federal Rules of Civil Procedure); *c.f. Vang v. Nevada*, 329 F.3d 1069, 1072-74 (9th Cir. 2003) (finding procedural default defense waived by failing to raise it in responsive pleading or motion to dismiss).

The state courts rejected the claim in Ground 1 during the second round of postconviction review proceedings, by employing state procedural rules, including  NRS § 34.726(1) and NRS §§ 34.810(1)(b)(2), which have been found to be independent and adequate state procedural bars. (ECF No. 65-23 at 2.) *See, e.g.*, *Williams v. Filson*, 908 F.3d 546, 580 (9th Cir. 2018); *Vang*, 329 F.3d at 1073-74; *Bargas v. Burns*, 179 F.3d 1207, 1211-14 (9th Cir. 1999); *Moran v. McDaniel*, 80 F.3d 1261, 1269-70 (9th Cir. 1996). *See also Coleman*, 501 U.S. at 729-30 (acknowledging federal habeas relief is barred when a state court declined to address a prisoner's federal claims on the basis that the prisoner failed to meet a state procedural requirement because granting federal habeas relief in those circumstances would render ineffective an independent and adequate state-procedural rule); *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) ("An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court.").

For these reasons, Respondents did not forfeit or waive the exhaustion and procedural default defenses because they were raised in their answer to the Petition and the claim in Ground 1 is technically exhausted by procedural default.

### b.   Cardenas' failures to develop the state court record and to meet the requirements of 28 U.S.C. § 2254(e)(2)

Before resolving the parties' dispute as to whether Cardenas can overcome the procedural default of this claim under *Martinez*, the Court must determine whether or not it may consider Cardenas's declaration (ECF No. 40-7) or the alleged plea offer (ECF No. 40-4), or grant the Motion for Evidentiary Hearing (ECF No. 87), submitted in support of

Ground 1. *See Shoop v. Twyford*, 596 U.S. 811, 820 (2022) (directing that, before facilitating evidence that was not developed in the state-court proceedings, federal habeas courts must first determine such evidence "could be legally considered in the prisoner's case") (citing *Shinn*, 596 U.S. at 389-90).

Generally, the merits of claims raised in a federal habeas corpus petition are decided on the record that was before the state court when it adjudicated a claim. *See Cullen*, 563 U.S. at 180-81. AEDPA restricts a federal habeas court's authorization to hold an evidentiary hearing where an applicant failed to develop a factual basis for a claim in state court proceedings:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
>> (A) the claim relies on—
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B). The Supreme Court has held that although § 2254(e)(2) refers only to evidentiary hearings, its provisions apply to a federal habeas court's consideration of evidence. *See McLaughlin v. Oliver*, 95 F.4th 1239, 1248-49 (9th Cir. 2024) (acknowledging *Shinn* "reaffirmed that [2254(e)(2)]'s restrictions not only apply to evidentiary hearings, but also apply "when a prisoner seeks relief based on new evidence *without* an evidentiary hearing") (citing *Shinn*, 596 U.S. at 389; quoting *Holland v. Jackson*, 542 U.S. 649, 653 (2004)).

For purposes of determining whether a petitioner must first meet the prerequisites of § 2254(e)(2), the term "fail" means "the prisoner must be 'at fault' for the undeveloped

record in state court." *Williams v. Taylor*, 529 U.S. 420, 432, 434 ("[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."). *See also Shinn*, 596 U.S. at 383 (affirming the prerequisites in § 2254(e)(2) apply only "when a prisoner 'has failed to develop the factual basis of a claim'"). "Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, *in light of the information available at the time*, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435 (emphasis added). "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court *in the manner prescribed by state law*." *Id.* at 437 (emphasis added). *See also Baja v. Ducharme*, 187 F.3d 1075, 1079 (9th Cir. 1999) (denying evidentiary hearing because petitioner did not comply with state law that required petitioner to come forward with affidavits or other evidence to the extent his claim relied on evidence outside the record).

The Supreme Court has stated the opening clause of § 2254(e)(2) is triggered by state-postconviction-review counsel's failure to investigate matters for which counsel was on notice in any, but a cursory, manner. *See Williams*, 529 U.S. at 439-440. *See also Shinn*, 596 U.S. at 371, 385 (holding the negligence of postconviction counsel is attributed to the prisoner and "the equitable rule announced in *Martinez*" does not permit a federal court "to dispense with § 2254(e)(2)'s narrow limits because a prisoner's state postconviction counsel negligently failed to develop the state-court record"). For example, the Supreme Court has held a prisoner responsible for state postconviction counsel's negligent failure to develop the state-court record where the petitioner claimed state postconviction counsel did not heed the petitioner's pleas for assistance. *See Holland*, 542 U.S. at 653.

The state-court record shows Cardenas failed to develop the factual basis for the claim in Ground 1 because he and his state postconviction counsel were aware of the claim and the documents, but failed to present them to the state courts in a procedural

context in which those documents and the claim would be considered. *See Williams*, 529 U.S. at 437. Cardenas alleges he discovered the plea offer in June of 2012. (ECF No. 39 at 15.) Yet, he did not amend his initial *pro se* state petition before it was denied in August of 2012. (ECF No. 46-40.) On remand, his appointed state postconviction counsel reviewed the case file, met with Cardenas, and filed a supplemental points and authorities to support the *pro se* petition in December of 2013, but did not present the claim, the declaration, or the alleged plea offer, to the state district court before the denial of the initial *pro se* petition in March of 2014. (ECF No. 47-2.) Based on Cardenas's allegation that he had notice of the plea offer in June of 2012, he and his postconviction counsel were on more than cursory notice of the factual basis of the claim at a time and in an appropriate procedural context, to raise the claim before the state courts. *See Williams*, 529 U.S. at 439-40. *See also Shinn*, 596 U.S. at 385. The requirements of § 2254(e)(2) were thus triggered by the negligence of Cardenas and his state postconviction counsel who each failed to assert the claim, supporting declaration, and the alleged plea offer in the state district court.

To consider Cardenas's subsequent belated efforts a cure for his negligent failure to develop the factual basis for his claim, when he and his postconviction counsel were each on more than cursory notice of the claim and alleged factual basis during a time when the state procedural bars would not have prevented presentation of the claim and supporting evidence, would reduce AEDPA's requirements to a meaningless formality. *See McLaughlin*, 95 F.4th at 1248-49 (holding effort to develop factual basis of claim in successive state petition that state courts did not consider due to the failure to comply with state procedural rules "counts as a 'fail[ure] to develop the factual basis of a claim in [s]tate court proceedings' under 2254(e)(2), as construed in *Shinn*, 596 U.S. at 375-76 . . . . .").

Cardenas's Motion for an Evidentiary Hearing asserts this Court may conduct a hearing for the exclusive purpose of determining whether he has shown good cause under *Martinez* to overcome the procedural default of Ground 1. (ECF No. 89 at 2.) The

Supreme Court in *Shinn*, however, stated, that where § 2254(e)(2) applies and the prisoner cannot satisfy its stringent requirements, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*." *Shinn*, 596 U.S. at 389. Moreover, Cardenas's reliance on Ninth Circuit authority that predates *Shinn*, and post-*Shinn* authority from the Fifth Circuit Court of Appeals that held § 2254(e)(2) inapplicable to a *Martinez* analysis based on the reasoning that a *Martinez* analysis or *Martinez* hearing is not a "hearing on a claim" is no longer persuasive. (ECF No. 87 at 9.) *See Detrich*, 740 F.3d at 1247 (plurality op. of Fletcher, J.); *Mullis v. Lumpkin*, 70 F.4th 906, 910 (5th Cir. 2023).

The Ninth Circuit Court of Appeals has acknowledged *Shinn*'s holding restricts a federal habeas court's authority to consider for *Martinez* purposes, evidence that is not contained in the state-court record. *See McLaughlin*, 95 F.4th at 1246, 1249 (stating that 2254(e)(2), as construed in *Shinn*, overruled Ninth Circuit authority under which the Circuit previously remanded for an evidentiary hearing and consideration of new evidence on the merits of a procedurally defaulted IAC claim). S*ee also Creech v. Richardson*, 59 F.4th 372, 387-88 (9th Cir. 2023) (recognizing *Shinn* restricts "the circumstances in which a federal habeas court deciding *Martinez* claims may consider evidence beyond that already contained in the state court record").

The Fifth Circuit Court of Appeals' post-*Shinn* decision in *Mullis*, 70 F.4th at 910-11, which held that "evidence outside the state record is admissible in *Martinez* claims for the limited purpose of establishing an excuse for procedural default" because Fifth Circuit precedent was not abrogated by *Shinn*, is not in accord with either Ninth Circuit authority or the existing weight of post-*Shinn* authority in other Circuits. *See McLaughlin*, 95 F.4th at 1249; *Rogers v. Mays*, 69 F.4th 381, 396 (6th Cir. 2023) (en banc) (acknowledging that *Shinn* holds petitioners responsible for counsel's failure to develop the state court record, and where a claim finds no support in the state-court record, petitioner must meet the requirements of § 2254(e)(2) before he can present new evidence in federal habeas proceedings); *Stokes v. Stirling*, 64 F.4th 131, 136 (4th Cir. 2023) (holding *Shinn* prohibits

introduction of new evidence in support of *Martinez* claims); *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 721-24 (3d Cir. 2022) (holding that although *Shinn* did not abrogate Third Circuit precedent holding AEDPA allows factual development for purposes of *Martinez*, a district court may not use the expanded record to decide the merits of a petitioner's IAC claim, making a *Martinez* hearing a waste of time unless a petitioner can prevail on the state record).

Cardenas's reliance on *West v. Ryan*, 608 F.3d 477 (9th Cir. 2010), and *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009), is unpersuasive because they are distinguishable on their facts. (ECF No. 87 at 6-7.) In each of those cases, the petitioner and state postconviction counsel diligently attempted to develop the state-court record to support constitutional claims but were thwarted by the state courts' repeated denials of their requests for funds and an evidentiary hearing. *See West*, 608 F.3d at 483-85; *Libberton*, 583 F.3d at 1165. By contrast, Cardenas fails to meet the threshold requirement of diligence because, although he and his state postconviction counsel allegedly possessed the alleged plea offer during the initial state postconviction review proceedings before the state district court, they failed to assert the claim or present documents to develop the factual basis for the claim during those proceedings.

Because Cardenas failed to develop a factual basis to support this claim in accordance with state procedural rules, he must meet the requirements of § 2254(e)(2) before the Court may, in considering *Martinez* or the merits, grant an evidentiary hearing or consider his declaration or the alleged plea offer. *See Shinn*, 596 U.S. at 382, 385, 389; *Williams*, 529 U.S. at 439-40; *Holland*, 542 U.S. at 653. Cardenas does not allege that he can meet the requirements of § 2254(e)(2) and the record does not support a finding that he did so. The Court therefore denies the Motion for an Evidentiary Hearing (ECF No. 87) and concludes it may not consider the alleged plea offer (ECF No. 40-4) or Cardenas's declaration (ECF No. 40-7). *See Shinn*, 596 U.S. at 371.

///

///

### c.   Lack of factual basis to support Ground 1 claim under *Martinez*

Cardenas contends he can overcome the default under *Martinez* even without Cardenas's declaration and the alleged plea offer. (ECF No. 85 at 15-16.) Cardenas fails to do so because, without Cardenas's declaration or the alleged plea offer, the claim that trial counsel's performance was deficient under *Strickland* is wholly without factual support. *See e.g.*, *Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting a petitioner's claim, in part, because "[o]ther than [petitioner's] own self-serving statement, there [was] no evidence" to support his allegations); *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (explaining that the petitioner's "self-serving statement, made years later," was insufficient to support the petitioner's claim). The existing state court record that is subject to consideration is bereft of any mention that the State communicated any plea offer to defense counsel after the State rescinded the executed guilty plea agreement. *See Martinez*, 566 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). Thus, for the foregoing reasons, Ground 1 is dismissed with prejudice as procedurally defaulted.

### B.   Ground 2—IAC for Failure to Challenge Juror for Bias

Cardenas alleges in Ground 2 that trial counsel was ineffective in failing to move to excuse Juror 11 for presumptive bias. (ECF No. 39 at 17-19.) This Court ruled the claim is technically exhausted by procedural default, subject to the question whether Cardenas can overcome the default under *Martinez*. (ECF No. 72 at 4-5.) As explained, *see supra*, pp. 9-10, the principal issues are: (1) whether Cardenas's ineffective assistance of trial counsel claim is substantial; (2) if so, whether Cardenas's initial state postconviction counsel was ineffective in failing to raise this claim in the state district court; and (3) if so, whether, on the merits Cardenas was denied effective assistance of counsel under the standards set forth in *Strickland*. *See Martinez,* 566 U.S. 1, 14-18.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.      Additional background

At jury selection, the prospective jurors were asked to raise their hands if they knew any of the witnesses, and others related to the case, whose names were written on a board. (ECF No. 45-50 at 30-33.) Prospective Juror McCaslin disclosed that she and witness, Sharon Wehrly, worked on community projects together for 17 years, McCaslin's son was Wehrly's farrier, McCaslin had been to Wehrly's home, and she would "probably" consider them close friends, but she would "not necessarily" give weight to Wehrly's opinion. (ECF No. 45-50 at 31-36, 45-51, 56-58, 90.) Trial counsel moved to excuse McCaslin for cause. (*Id.*) The State indicated that Wehrly was on the witness list only because she prepared a PowerPoint presentation for the State and the State did not anticipate calling her as a witness. (*Id.*) The trial court denied the motion to excuse McCaslin stating that it did so because neither party intended to call McCaslin as a witness at trial. (*Id.*)

Prospective Juror Austin indicated he knew witness Marotta because he made cabinets for Marotta on three occasions, and although Austin had never done anything personal with Marotta, Austin considered them "friends," and said he would give Marotta's opinion good weight because he was a "good guy" and "he seems like a nice guy." (ECF No. 45-50 at 37, 45-46, 58-63, 90.) The defense challenged Austin for cause (*Id.*) The State indicated that it did not anticipate calling Marotta as a witness and the chances of doing so were remote. (*Id.*) The trial court denied the motion, stating:

> THE COURT: My concern is establishing a standard that working for someone or having an acquaintanceship with them in this town is sufficient grounds for release, because almost everybody in this town is acquainted with one another and does work for one another and so forth.
>
> So if we establish that standard, we're going to lose a lot of jurors. If there was anything above that standard, if he had answered any of the questions in affirmative, I would be inclined to release him. But I don't think he met that standard.

(*Id.*) The defense exercised three of its eight peremptory challenges and waived the remaining five peremptory challenges for seated jurors. (ECF No. 45-50 at 2.) The defense peremptorily excused McCaslin and Austin. (*Id.* at 90, 94.) The defense excused

prospective juror Herron who sold the judge a vehicle and played golf every Sunday with a Metro police officer. (*Id.* at 37-38, 70, 78.) The defense exercised a peremptory challenge against prospective alternate juror Mills, a schoolteacher who taught the prosecutor's daughter and possibly witness Murphy. (*Id.* at 114-18.) The defense waived peremptory challenge against first alternate juror McCay who disclosed that he did not know anyone listed on the board but had a cousin who worked at the Georgia Sheriff Department, a father-in-law who had been a Las Vegas police officer, and that his wife's uncle and cousin worked for Metro. (*Id.* at 111-18.)

Juror 11 (Sparno) was not specifically asked whether he recognized the name of any individual listed on the board. (ECF No. 45-50 at 102-03.) He disclosed he had worked at various casinos in Las Vegas but did not disclose that he worked at the Nugget in Pahrump at the time of trial. (*Id.* at 104-05.) He stated he would follow the law as given to him, agreed the defendant was innocent until proven guilty, and confirmed he could be fair to both sides. (*Id.* at 102-03.) The defense passed Juror 11 for cause and waived peremptory challenge. (*Id.* at 105.) When Juror 1 subsequently revealed that she knew Juror 11 because he was a card dealer at the Nugget in Pahrump, the parties presumably knew that Sundstrom worked there, but none of the parties questioned Juror 11 about whether he knew Sundstrom and Juror 11 was seated on the jury. (*Id.* at 108.)

After the prosecutor delivered opening remarks to the jury, during which the prosecutor repeatedly referred to Sundstrom as "Emma," and in the presence of the other jurors, Juror 11 alerted the trial court that he might know Sundstrom:

MS. REPORTER: Judge, a juror is waving his hand.

THE COURT: One moment.

JUROR NO. [11]: I am not sure, but I work at the Pahrump Nugget. And if it's the same lady that's involved in this, Emma. I know an Emma. If she is the same person, I don't know by last names. If she's a cocktail waitress, then I know her as an acquaintance as an employee there. I don't know if it's the same one, because I don't know the last name.

THE COURT: Okay. You will get the opportunity to see her. You will let us know privately?

JUROR NO. [11]: Yes.

1    THE COURT: Okay. Very good.

2    (ECF No. 45-50 at 102-05, 107-08; 45-55 at 14-15; 92-13 at 14-15.[9]

3    Sundstrom later testified she worked as a bartender/cocktail waitress at the

4    Pahrump Nugget. (ECF No. 92-13 at 41.) The trial court held a recess during which Juror

5    No. 11 confirmed that he was acquainted with Sundstrom and that he had seen her the

6    night before she testified at trial, but the defense did not object to Juror 11's service:

7    THE COURT: [Y]ou mentioned earlier that you might be acquainted with
     this young lady from her work. And I believe that this is the same lady,
8    correct?

9    JUROR NO. 11: Yes, it is. I did see her last night. I do work with her.

10   THE COURT: Now, is there anything about that acquaintanceship that
     influences you in any way to give her more or less credibility than any other
11   witness?

12   JUROR NO. 11: No, no.

13   THE COURT: Anyone desire to ask him about this?

14   [DEFENSE COUNSEL]: Just briefly.

15   How long have you known—worked with her at the Nugget?

16   JUROR NO. 11: I do believe I started—it will be almost three years.

17   [DEFENSE COUNSEL]: And during the course of the time that you've
     worked with her, had you ever had occasion to talk with her?
18
     JUROR NO. 11: I did not see her that much because I work on day shift,
19   she works basically swing. Sometimes a few times a month maybe, and the
     only conversation I had with her was if I see her at the pit when I'm dealing
20   and I'm on a dead game, Good morning or Good afternoon, and that was
     very rare that I seen [sic] her.
21
     [DEFENSE COUNSEL]: But it's nothing more than that?
22
     JUROR NO. 11: No.
23
     [DEFENSE COUNSEL]: Thank you.
24
     THE COURT: Anybody have any problem with him remaining on the jury?
25
     [DEFENSE COUNSEL]: No.
26

27    [9]The trial transcript mistakenly indicates Juror 10 made these statements;
     however, review of the trial record clarifies Juror Sparno was designated Juror 11 and
28   was the Juror who knew Sundstrom from their mutual place of employment. (ECF Nos.
     45-50 at 102, 108; 45-51 at 2; 92-13 at 14-15.)

(ECF No. 92-14 at 23-24.)

## 2.    Standards for Evaluating Juror Bias

The Sixth Amendment guarantees criminal defendants a fair trial, which assumes "a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). "A defendant is denied the right to an impartial jury even if only one juror is biased or prejudiced." *Fields v. Woodford*, 309 F.3d 1095, 1103 (9th Cir. 2002).

Jurors are presumptively impartial. *See Murphy v. Fla.*, 421 U.S. 794, 800 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (recognizing "'the presumption of a prospective juror's impartiality'")). Nonetheless, "[a] juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 799-800. And because the right to an impartial jury is constitutive of the right to a fair trial, "[d]oubts regarding bias must be resolved against the juror." *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991)); *see also United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000) (explaining a juror "may well be objective in fact, but the relationship is so close that the law errs on the side of caution.").

Actual bias on the part of a juror is "'bias in fact'-the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (citing *Gonzalez*, 214 F.3d at 1112 and quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)). "Actual bias is found where a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." *Id.* (quoting *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007)). "The Supreme Court has suggested that the relevant test for determining whether

27

a juror is biased is 'whether the juror[ ] . . . had such fixed opinions that [he] could not judge impartially the guilt of the defendant." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) (holding trial counsel not ineffective in failing to exercise peremptory challenges against jurors whose responses to voir dire did not demonstrate actual or implied bias or fixed views about the death penalty or the defendant's guilt) (quoting *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995) (alterations in original)).

Presumptive or implied bias is "bias conclusively presumed as a matter of law" "regardless of actual partiality." *United States v. Wood*, 299 U.S. 123, 133-34 (1936); *Gonzalez*, 214 F.3d at 1111. Bias should be presumed only in "extreme" or "extraordinary" cases. *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) (quoting *Smith*, 455 U.S. at 222, 223 n.*, (O'Connor, J., concurring)). The Second Circuit Court of Appeals has acknowledged Blackstone's comments that, at common law, implied bias was considered appropriate upon showing:

> [T]hat [a juror] is of kind to either party within the ninth degree; that he has been arbitrator on either side; that he has an interest in the cause; that there is an action pending between him and the party; that he has taken money for his verdict; that he has formerly been a juror in the same cause; that he is the party's master, servant, counsellor, steward, or attorney, or of the same society or corporation with him.

*Torres*, 128 F.3d at 45 (quoting *Smith*, 455 U.S. at 232 (Marshall, J., dissenting)).

Unlike for actual bias, in which the juror's answers on voir dire are examined for evidence that she was in fact partial, "the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced." *Gonzalez*, 214 F.3d at 1112 (quoting *Torres*, 128 F.3d at 45). In finding implied bias, the Ninth Circuit has agreed with the observation of the Third Circuit: "That men will be prone to favor that side of a cause with which they identify themselves either economically, socially, or emotionally is a fundamental fact of human character." *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977) (quoting *Kiernan v. Van Schaik*, 347 F.2d 775, 781 (3d Cir. 1965). Bias "[c]an be revealed by a juror's express admission of that fact, but, more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be

revealed by circumstantial evidence." *Allsup*, 566 F.2d at 71.

The Ninth Circuit has held that prejudice is presumed "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Gonzalez*, 214 F.3d at 1112 (citing *Tinsley*, 895 F.2d at 527). The Ninth Circuit has explained that "the relevant question is whether [the] case present[s] a relationship in which the potential for substantial emotional involvement, adversely affecting impartiality, is inherent." *Id.* (internal quotation marks omitted) (citing *United States v. Plache*, 913 F.2d 1375, 1378 (9th Cir. 1990) (quoting *Tinsley*, 895 F.2d at 527)). In *Allsup*, two prospective jurors in a bank robbery trial were employees of the bank that was robbed but did not work at the particular branch that was robbed. *See* 566 F.2d at 71-72. The prospective jurors stated they could decide the case fairly, and served on the jury after the district court found them to be unbiased and rejected a defense challenge for cause. *See id.* The Ninth Circuit reversed, holding "[t]he employment relationship coupled with a reasonable apprehension of violence by bank robbers leads us to believe that bias of those who work for the bank robbed should be presumed." *Id.* The Court in *Allsup* explained that "[t]he potential for substantial emotional involvement, adversely affecting impartiality, is evident when the prospective jurors work for the bank that has been robbed," and "[p]ersons who work in banks have good reason to fear bank robbery because violence, or the threat of violence, is a frequent concomitant of the offense." *Id.* The Circuit in *Allsup* concluded that there was a substantial probability that the prospective bank teller jurors, despite their disclaimers, could not become the "indifferent" jurors which the Constitution guarantees a criminal defendant. *Id.* (citing *Irvin*, 366 U.S. at 722 ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.").

"Because the implied bias standard is essentially an objective one, a court will, where the objective facts require a determination of such bias, hold that a juror must be recused even where the juror affirmatively asserts (or even believes) that he or she can

and will be impartial." *Gonzalez*, 214 F.3d at 1113 (citing *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998) ("Even if the putative juror swears up and down that it will not affect his judgment, we presume conclusively that he will not leave his kinship at the jury room door."). A juror's "statements that reflect a lack of impartiality may be relevant to a determination of implied bias," and "[a] juror's responses that cast doubt upon his ability or willingness to serve impartially will be considered along with the relevant objective factors in determining whether implied bias exists." *Id.* (citing *Dyer*, 151 F.3d at 984 (holding juror's responses and conduct, in combination with her personal history, "add[ed] up to that rare case where we must presume juror bias") and *Burton*, 948 F.2d at 1159 (holding that a new trial was warranted because bias was presumed where juror gave dishonest responses and juror was living in an abusive situation similar to that presented at trial)).

The Ninth Circuit has indicated that presumptive bias may be appropriate where the credibility of a witness is in issue and the juror has a relationship to that witness. *See, e.g., Plache*, 913 F.2d at 1378 (holding no abuse of discretion in denying motions to excuse juror, who was a letter carrier in a mail fraud case, for implied bias because, among other things, the credibility of a postal official was not in issue). However, the Ninth Circuit has not squarely addressed whether bias must be presumed for a juror who knows the alleged victim in a sexual assault case in which the victim's credibility is in issue and has rarely presumed bias where a juror had a relationship with the alleged victim. *See, e.g., Allsup*, 566 F.2d at 71-72; *cf. Nathan v. Boeing Co.*, 116 F.3d 422, 425 (9th Cir. 1997) (distinguishing *Allsup* and holding there was no similar "reasonable apprehension of violence" coupled with the employment relationship where two jurors employed by one of the parties would not fear employer's "retaliatory" practices if the jurors decided against their employer); *United States v. Panza*, 612 F.2d 432, 441 (9th Cir. 1979) (holding no abuse of discretion in failing to remove juror who banked with the branch that was allegedly robbed because the possibility the juror was biased was not so substantial as to require reversal but acknowledging that excusing the juror was the better practice).

The Supreme Court has recognized that a trial before a biased judge presents structural error but has not applied structural error to trials by biased or potentially biased jurors. *See Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (citing *Tumey v. State of Ohio*, 273 U.S. 510, 535 (1927)). However, the Ninth Circuit has held "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Dyer*, 151 F.3d at 973 (citing *Allsup*, 566 F.2d at 71). The Ninth Circuit reasons, "like a judge who is biased, the presence of a biased juror introduces a structural defect not subject to harmless error analysis." *Id.* (internal and other citations omitted).

The Ninth Circuit has also held that "[e]stablishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." *Davis*, 384 F.3d at 643 (citing *Quintero-Barraza*, 78 F.3d at 1349). The Ninth Circuit has further explained that, prejudice exists if counsel fails to question a juror during voir dire or move to strike a juror and that juror is found to be biased, because this evinces "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ruderman v. Ryan*, 484 F. App'x 144, 145 (9th Cir. 2012) (citing *Fields*, 503 F.3d at 776)*. See also Weaver v. Massachusetts*, 582 U.S. 286 (2017) (holding that in the narrow circumstances where a defendant raises a claim that trial counsel was ineffective in failing to object to structural error for violating the right to a public trial, prejudice is not automatic; rather, the burden is on the defendant to show a reasonable probability of a different outcome in the case as required by *Strickland*).

### 3. Analysis of Ground 2

#### a. The record establishes prejudice to overcome the default.

The Court first addresses the *Martinez* prejudice prong and determines the underlying trial counsel IAC claim is substantial. *See Martinez*, 566 U.S. at 14.

##### i. The claim that trial counsel's performance was deficient is substantial.

Respondents contend Cardenas cannot overcome the default because he fails to

establish a substantial claim that trial counsel's conduct was deficient and suggest either trial counsel made a strategic decision to forego a motion or that the motion would not have been granted because the trial court denied motions to excuse for cause other jurors who knew witnesses. (ECF No. 78 at 12-16.) For the reasons discussed below, fairminded jurists could conclude the record supports a substantial claim that trial counsel's failure to move to excuse Juror 11 for presumptive bias fell below an objective standard of reasonableness under the circumstances known to trial counsel at the time. *See Strickland*, 466 U.S. at 687-89.

> At the relevant time, sexual assault was defined as follows:

> A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.

NRS § 200.366(1), *as enacted by* Laws 2005, c. 507 § 27, eff. July 1, 2005. According to Nevada law, if jurors believe a sexual assault victim's testimony, they may convict a defendant solely on that victim's uncorroborated testimony. *See Washington v. State,* 922 P.2d 547, 551 (Nev. 1996).

The testimony at trial established that Sundstrom and Cardenas consumed significant amounts of alcohol on the night of the alleged sexual assault. *See supra,* pp. 2, 4. The parties agreed that Cardenas and Sundstrom had sexual contact, but disputed whether Sundstrom consented to the sexual contact or whether Cardenas's actions occurred under conditions in which he knew or should have known that Sundstrom was mentally or physically incapable of resisting or understanding the nature of her conduct. *See supra,* pp. 2-6. Trial counsel was aware that evidence would be admitted that would undermine Cardenas's credibility, i.e., that Cardenas had a prior conviction for second-degree murder, that Cardenas arguably fled the jurisdiction when facing his initial trial date, *see infra,* pp. 53-54, and that Cardenas failed a polygraph examination and admitted to the police that he initially lied to police and during the polygraph examination when he

said that he had no sexual contact with Sundstrom. (ECF Nos. 45-50 at 5-6; 92-15 at 12.) *See also supra,* pp. 4-6. Counsel also knew evidence would be admitted demonstrating Sundstrom had passed a lie-detector test. *See supra,* p. 5.

Sundstrom was the key witness for the prosecution's case and the jury was instructed that, if they believed Sundstrom, they could convict Cardenas based solely on her uncorroborated testimony. (ECF No. 45-60 at 33 (instructing the jury in Cardenas's case that, "[a] verdict of guilt may be based on the uncorroborated testimony of the victim alone so long as you are convinced that the State has proved each element of the crime beyond a reasonable doubt").) Against this backdrop, Juror 11 disclosed during trial that he and Sundstrom had cordial interactions a few times a month for nearly three years at their mutual place of employment, and that he saw her there the night before Sundstrom testified at trial. *See supra,* pp. 25-27.

Fairminded jurists could conclude trial counsel's failure to move to excuse Juror 11 for presumptive bias fell below an objective standard of reasonableness and did not constitute sound trial strategy. *Strickland*, 466 U.S. 689. Reasonable jurists could conclude that Juror 11's ongoing familiarity and interactions with Sundstrom, together with the fact that Sundstrom's believability was the cornerstone of the prosecution's case, and Juror 11 would be instructed he could convict Cardenas based solely on Sundstrom's uncorroborated believability, presented the type of rare and extraordinary circumstance in which bias must be presumed because the average person could not remain impartial in deliberations and because the case involved a relationship between the juror and a witness in which the potential for substantial emotional involvement adversely affecting impartiality was present. *See Gonzalez*, 214 F.3d at 1111; *Allsup*, 566 F.2d at 71-72. *See also Plache*, 913 F.2d at 1378.

Moreover, fairminded jurists could conclude there is no basis in the record to find that trial counsel's failure to seek the removal of Juror 11 had a reasonable strategic purpose. It is true that the trial court denied defense motions for cause to excuse two prospective jurors who were friends with witnesses. *See supra,* pp. 24-25. The State,

however, anticipated neither witness would be called to testify and trial counsel used peremptory challenges to excuse those prospective jurors. *See id.* And, ultimately, neither of the witnesses known to those two jurors testified. Unlike for prospective jurors who were friends of inconsequential witnesses who were not expected to, and did not testify, trial counsel inexplicably failed to move to excuse Juror 11, who, as discussed, had a direct relationship with the alleged victim, whose credibility was squarely in issue and whose credibility might be the sole basis for the outcome of the trial.

Fairminded jurists might be tempted to conclude trial counsel made a strategic decision to keep Juror 11, rather than replace Juror 11 with the first alternate juror, because the first alternate juror had family members who were involved in law enforcement. *See supra,* p. 25.[10] Trial counsel, however, did not exercise a peremptory challenge against the first alternate juror when he had the opportunity to do so. *Id.* Moreover, trial counsel waived five peremptory challenges leaving several jurors with family members who were in law enforcement.[11] And even if that was trial counsel's strategy, it could not be considered sound. *See Strickland*, 466 U.S. 689. The first alternate juror, in contrast with Juror 11, had no relationship with the victim or any other party or witness and would not be called upon to set aside numerous cordial interactions with Sundstrom in making a necessary determination of her credibility in order to render

---

[10]A Nevada trial court could allow an alternate juror to replace a disqualified juror under N.R.S. § 175.061(1). *See McKenna v. State,* 618 P.2d 348, 349 (1980) (holding trial court acted properly in allowing the alternate juror to deliberate in place of the disqualified juror rather than declare a mistrial).

[11]Juror McFarland knew the prosecutor because their children went to the same school, but McFarland had no personal dealings with the prosecutor. (ECF No. 45-50 at 63-66.) McFarland also had two relatives working as a 911 operator and a computer programmer at the Walnut Creek Police Department in California. (*Id.*) Juror Morian had been hired to work at the detention center and was due to start the following Monday but did not know any of the witnesses or trial participants. (*Id.* at 99-100.) Juror Lenke had a cousin and a nephew working in law enforcement in other states but no contact with either of them. (*Id.* at 91-93.) Juror Wilcox's cousin was a police officer in Indiana but Wilcox had not talked to him since he became an officer.[11] (*Id.* at 46, 67-68.) Juror Rocha had an ex-son-in-law who was a police officer in California but had no contact with him. (*Id.* at 45, 54-55.) Juror Sagapolutele's deceased husband had been a deputy sheriff in West Virginia. (*Id.* at 107.) Juror Baloga's deceased father-in-law had been in law enforcement. (*Id.* at 89.)

a verdict. *See supra*, p. 25.

For the foregoing reasons, Cardenas's IAC claim has "some merit," and is a "substantial" claim under *Strickland's* deficiency prong. *See Martinez*, 566 U.S. at 14.

### ii. The claim that trial counsel's performance was prejudicial is substantial.

Respondents contend Cardenas cannot overcome the default because he fails to establish a substantial claim that trial counsel's conduct was prejudicial, that the juror and the victim had a personal relationship, or that the juror was not impartial. (ECF No. 78 at 12-16.) Fairminded jurists could conclude trial counsel's failure to move to excuse Juror 11 for presumptive bias was prejudicial under *Strickland* because the record supports a conclusion that Juror 11 was presumptively biased. *See Strickland*, 466 U.S. at 695; *Davis*, 384 F.3d at 643; *Ruderman*, 484 F. App'x at 145.

It is true that Juror 11 agreed with the trial court that Juror 11's acquaintance with Sundstrom would not cause him to give Sundstrom more or less credibility than any other witness. *See supra,* p. 26. However, where the objective facts require a determination of presumptive bias, a juror must be recused even where the juror affirmatively asserts (or even believes) that they can and will be impartial. *See Gonzalez*, 214 F.3d at 1113.

The objective facts here demonstrate that Juror 11 had numerous interactions with Sundstrom that were cordial, i.e., positive, and that Juror 11's relationship with Sundstrom was not all in the past. *See supra,* 25-27. Indeed, Juror 11 saw Sundstrom at their mutual place of employment on the night before Sundstrom testified. *Id.* And the record fails to negate the conclusion that, due to their employment at the same establishment, they would see each other posttrial. *Id.*

Based on the facts in the record, fairminded jurists could conclude that bias must be presumed. Juror 11's ongoing familiarity and friendly interactions with Sundstrom, together with the fact that Sundstrom was the alleged victim in a sexual assault case where her credibility was the primary issue to be decided, and where the jury would be instructed it could find Cardenas guilty based solely on Sundstrom's uncorroborated testimony, it is highly unlikely the average person in Juror 11's circumstances could

maintain impartiality. *See Gonzalez*, 214 F.3d at 1112. The likelihood that Juror 11 would encounter Sundstrom at their mutual place of employment posttrial, presented the potential for substantial emotional involvement that could adversely affect impartiality because the juror might feel pressure to resolve the credibility determination in Sundstrom's favor. *See id.*; *Allsup*, 566 F.2d at 71-72. *See also Plache*, 913 F.2d at 1378. Accordingly, there is a substantial claim that trial counsel's failure to move to excuse Juror 11 was prejudicial. *See Davis*, 384 F.3d at 643. And for this reason, Cardenas's IAC claim has "some merit," and is a "substantial" claim under *Strickland's* prejudice prong. *See Martinez*, 566 U.S. at 14.

### b.   The record establishes cause to overcome the default.

Because Cardenas has established a substantial claim of prejudice under *Martinez*, he must establish "cause" under *Martinez* by demonstrating that counsel for the initial-review collateral proceeding, where the claim should have been raised, was ineffective under *Strickland*. *See Martinez*, 566 U.S. at 14. As discussed, postconviction counsel's failure to raise a claim that trial counsel was ineffective in failing to excuse Juror 11 for presumptive bias constitutes ineffective assistance. *See Strickland*, 466 U.S. at 687-88.

### i.   Postconviction counsel's performance was deficient.

Respondents contend Cardenas cannot overcome the default because he fails to establish that postconviction counsel was ineffective in failing to raise the IAC claim. (ECF No. 78 at 12-16.) The record, however, supports Cardenas's claim that postconviction counsel's failure to raise the IAC claim constitutes deficient performance because it fell below an objective standard of reasonableness under the circumstances known to postconviction counsel. *See Strickland*, 466 U.S. at 687-89.

An objectively reasonable postconviction attorney, whose task is to identify meritorious claims that trial counsel was ineffective, would review the trial record and recognize that the record supports a claim that trial counsel's failure to move to excuse

Juror 11 for presumptive bias was not reasonably strategic and fell below an objective standard of reasonableness under the circumstances known to trial counsel at the time of Juror 11's disclosure. *See supra,* at pp. 24-36. An objectively reasonable postconviction attorney would also have realized the record supports a finding that trial counsel's failure to move to excuse Juror 11 for presumptive bias was prejudicial because the record supports a finding that Juror 11 was presumptively biased under the circumstances of the case. *See id.*. And, an objectively reasonable postconviction attorney would have realized that the presence of a biased juror is reversible error warranting a new trial. *See supra,* at pp. 31-32.[12] Thus, the record supports Cardenas's claim that his postconviction counsel's performance was deficient. *Strickland*, 466 U.S. at 687-89.

### ii. Postconviction counsel's performance was prejudicial.

The Ninth Circuit has explained that, in the context of a *Martinez* analysis, the question whether postconviction counsel's performance was prejudicial is not based on whether the particular [postconviction review] court would have rendered a more favorable decision, but whether some reasonable [postconviction review] court might have done so. *See Leeds*, 75 F.4th at 1023. Thus, the Court reviews whether the record supports Cardenas's claim that, if postconviction review counsel had raised the IAC claim, a reasonable Nevada court could have granted his postconviction petition.

As discussed, the record supports a finding that trial counsel's performance was deficient and prejudicial, and that Juror 11 was presumptively biased. *See supra*, pp. 24-36. There is therefore a reasonable probability postconviction counsel would have succeeded in demonstrating that trial counsel's failure to move to excuse Juror 11 for presumptive bias was prejudicial and a reasonable probability the state supreme court would have granted the writ. *See Davis*, 384 F.3d at 643; *Ruderman*, 484 F. App'x at 145.

---

[12]There is also no conceivable strategic justification for postconviction counsel's failure to raise the trial counsel IAC claim during Cardenas's initial state postconviction review proceedings because Cardenas's initial state petition advanced claims seeking a new trial as did postconviction counsel's Supplemental Points And Authorities in Support of Postconviction Writ. (ECF Nos. 12-8; 12-11 at 17.)

Therefore, the record supports the finding that postconviction counsel's failure to pursue the trial counsel IAC claim prejudiced Cardenas. *See Strickland*, 466 U.S. at 695.

        **c.**     **The record establishes trial counsel was ineffective.**

As discussed above, Cardenas has established cause and prejudice to overcome the procedural default of this claim under *Martinez*. Thus, the Court reviews whether Cardenas's underlying ineffective assistance of trial counsel claim has merit under *Strickland*. Respondents contend Cardenas cannot establish that trial counsel's conduct was deficient or demonstrate prejudice given the evidence of Cardenas's flight and the testimony of the rebuttal witness. (ECF No. 78 at 12-16.)

For the reasons discussed above, the Court cannot conclude that trial counsel's failure to seek removal of Juror 11 was a reasonable strategic decision under the circumstances of this case. Moreover, the record supports a finding that trial counsel's failure to seek removal of Juror 11 for presumptive bias fell below an objective standard of reasonableness. An objectively reasonable trial attorney, familiar with the evidence concerning credibility that would be presented in this case, familiar with the rule allowing the jury to convict Cardenas solely on the uncorroborated believability of Sundstrom and having a basic familiarity with the law of presumed or implied bias, would have moved to excuse Juror 11 as presumptively biased as soon as Juror 11 disclosed the details about his relationship with Sundstrom. *See Strickland*, 466 U.S. at 687-89.

And as discussed, trial counsel's failure to move to excuse Juror 11 prejudiced Cardenas because the record supports a finding that Juror 11 was presumptively biased. The jJuror's disclosures reveal that he was implicitly predisposed to believe Sundstrom's testimony due to his on-going familiarity with Sundstrom, including seeing her on the night before Sundstrom testified at trial, and their multiple amicable interactions at their mutual place of employment over a three-year period. Because the case was highly, if not solely, dependent upon a calculus of Sundstrom's believability, fairminded jurists could conclude that it was highly unlikely that the average person in Juror 11's circumstances could maintain impartiality in deliberations. *See Strickland*, 466 U.S. at 694-95. *See also*

*Gonzalez*, 214 F.3d at 1112; *Davis*, 384 F.3d at 643; *Allsup*, 566 F.2d at 71-72; *Plache*, 913 F.2d at 1378. And because Juror 11 was likely to encounter Sundstrom at their mutual place of employment posttrial, the case presented the potential for substantial emotional involvement that could adversely affect impartiality because the juror could feel pressure to resolve the credibility determination in Sundstrom's favor. *See Strickland*, 466 U.S. at 687-89. Thus, there is a reasonable probability the result of the proceeding would have been different had trial counsel moved to excuse Juror 11 for presumptive bias because the record supports a finding that this case presents a rare and extraordinary instance where bias must be presumed.

Accordingly, the Court grants a writ of habeas corpus for Ground 2.

## C.     Ground 3—Violation of Right to Secured Autonomy Under *McCoy*

Cardenas alleges his right to secured autonomy was violated when trial counsel contradicted Cardenas's defense and effectively conceded his guilt during opening and closing remarks at trial, in violation of the Supreme Courts holding in *McCoy v. Louisiana*, 584 U.S. 414 (2018). (ECF Nos. 39 at 19-24; 85 at 25-29.) Cardenas alleges he can overcome the procedural default of this claim by demonstrating cause and prejudice because Ground 3 is based on a new rule of law that was unavailable when he filed his initial state court postconviction petition. (ECF No. 68 at 7; 72 at 6.) Respondents contend the default cannot be overcome because the rule in *McCoy* does not apply retroactively on collateral review. (ECF No. 78 at 16-17.) This Court ruled this claim is technically exhausted by procedural default and deferred ruling whether Cardenas can overcome the procedural default until its consideration of the merits. (ECF No. 72 at 5-6.) The Court concludes Cardenas cannot overcome the procedural default because *McCoy's* rule is not retroactively applicable on collateral review. Thus, Ground 3 is dismissed as defaulted.

Where a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

1    alleged violation of federal law, or demonstrate that failure to consider the claims will

2    result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To demonstrate

3    cause, the petitioner must establish that some external and objective factor impeded

4    efforts to comply with the state's procedural rule. *See, e.g.*, *Murray v. Carrier*, 477 U.S.

5    478, 488 (1986); *Hiivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999). "To establish

6    prejudice, [a petitioner] must show not merely a substantial federal claim, such that 'the

7    errors at . . . trial created a possibility of prejudice,' but rather that the constitutional

8    violation 'worked to his actual and substantial disadvantage.'" *Shinn*, 596 U.S. at 379-80

9    (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original).

10       *McCoy* was decided in 2018—several years after Cardenas's direct appeal was

11   final and after he filed his initial state postconviction review petition in 2012. (ECF No. 46-

12   28.) In *McCoy*, the Supreme Court held that under the Sixth Amendment, "a defendant

13   has the right to insist that counsel refrain from admitting guilt, even when counsel's

14   experienced-based view is that confessing guilt offers the defendant the best chance to

15   avoid the death penalty." *McCoy*, 584 U.S. at 417. The Court explained that "it is the

16   defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit

17   guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence,

18   leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.* at 417-18. In

19   McCoy's trial, defense counsel reasonably believed the objective of his representation

20   was avoidance of the death penalty and planned to concede McCoy killed three people

21   while arguing McCoy lacked specific intent to kill them as required for murder; however,

22   McCoy testified at trial, maintained his innocence, and objected to counsel's strategy. *See*

23   *id.* at 418-19, n.1. The Supreme Court ruled that the trial court erred because "once

24   [McCoy] communicated that to court and counsel, [and] strenuously object[ed] to [his

25   counsel's] proposed strategy, a concession of guilt should have been off the table," and

26   the "trial court's allowance of [defense counsel's] admission of McCoy's guilt despite

27   McCoy's insistent objections was incompatible with the Sixth Amendment." *Id.* at 428.

28

1   The Supreme Court further ruled the trial court's error was structural. *See id.*[13]

2       "[T]he Supreme Court is the only entity that can make a new rule retroactive." *Tyler*

3   *v. Cain*, 533 U.S. 656, 663 (2001). *See also Christian v. Thomas*, 982 F.3d 1215, 1223

4   (9th Cir. 2020). *McCoy* was heard on direct appeal and the Supreme Court did not discuss

5   retroactivity. The Supreme Court has not in any subsequent decision held *McCoy* is

6   retroactive in a collateral review proceeding. *See Christian v. Thomas*, 982 F.3d 1215,

7   1224 (9th Cir. 2020). In 2021, the Supreme Court warned there is no longer any prospect

8   that a "watershed" new rule of criminal procedure will apply retroactively on federal

9   collateral review. *See Edwards v. Vannoy*, 593 U.S. 255, 272 (2021). The Supreme Court

10  explained that a new rule of criminal procedure will apply to cases that are on *direct*

11  review, even if the defendant's trial is concluded. *See id.* at 262. However, it further

12  explained, "It is time—probably long past time—to make explicit what has become

13  increasingly apparent to bench and bar over the last 32 years: New procedural rules do

14  not apply retroactively on federal collateral review," and the idea that a "watershed" rule

15  could constitute an exception to that rule should be considered "moribund" and "regarded

16  as retaining no vitality." *Id.*

17      Given that there is no Supreme Court authority holding that *McCoy* applies

18  retroactively to collateral review proceedings, the Ninth Circuit Court of Appeals has held

19  *McCoy's* ruling is not applicable retroactively on collateral review, and the tenor of the

20  Supreme Court's warning in *Edwards*, Cardenas has no basis to establish the rule in

21  *McCoy* has any retroactive application to his defaulted claim. Thus, he cannot overcome

22  the default of the claim and Ground 3 is dismissed as defaulted.

23      **D.    Ground 4—IAC—Admission of Polygraph Examination and Results**

24      Cardenas alleges trial counsel provided ineffective assistance by (1) advising

25  Cardenas to waive his privilege against self-incrimination and submit to a polygraph

26  examination; (2) stipulating to admission of the polygraph results and examinations of

27  _____

28          [13]The Court notes that the ruling in *McCoy* did not involve an IAC claim; rather, the ruling was that the trial court committed structural error. The Court further notes that, consistent with *McCoy*, Ground 3 is not an IAC claim.

Cardenas and Sundstrom; (3) failing to object to the polygrapher's testimony about the reliability of the results; and (4) failing to object to the jury instruction's characterization of polygraph results.[14] (ECF No. 39 at 24-27.) Cardenas argues the polygraph evidence was inadmissible because the prejudicial effect far outweighs any probative value due to its scientific unreliability. (*Id.*) He argues he was prejudiced because the polygraph evidence undermined his credibility and bolstered Sundstrom's credibility. (ECF No. 80 at 23.) He argues that but for counsel's errors, he would not have taken the polygraph examination, would not have lost the alleged plea offer (Ground 1), the polygraph results would not have been admitted at trial, the polygrapher would not have testified the polygraph results were reliable, and the jury instruction would not have suggested the polygraph results verified whether or not the examinee told the truth. (ECF Nos. 39 at 27; 85 at 21-23.) Respondents contend the Nevada Supreme Court's application of *Strickland* and rejection of the claims that trial counsel was ineffective in stipulating to the admission of the polygrapher's interview and test results was not objectively unreasonable, and that Cardenas cannot demonstrate counsel's actions were deficient or resulting prejudice. (ECF No. 78 at 17-20.) For the reasons discussed below, the state supreme court reasonably applied *Strickland* when it rejected Grounds 4(A) and (B), and there is no merit to the claims raised by Grounds 4(C) and (D).

### 1.    Applicable legal principles

"In Nevada, polygraph results may be considered reliable when taken under proper conditions and with proper safeguards in place." *Jackson v. State*, 997 P.2d 121, 121-22 (Nev. 2000) (citing *Corbett v. State*, 584 P.2d 704, 705 (Nev. 1978); *Domingues v. State*, 917 P.2d 1364  (Nev. 1996)). "[T]he safeguards include the requirement of a written stipulation signed by the prosecuting attorney, the defendant, and his counsel providing for defendant's submission to the test." *Jackson*, 997 P.2d at 122 (citing *Corbett*, 584 P.2d at 705). "Absent a written stipulation, polygraph evidence is properly excluded." *Id.* (holding the district court, consistent with the decision in *Corbett,* properly excluded the

---

[14]The Court subdivides Ground 4 for ease of reference.

1 | test results for lack of a written stipulation by all of the parties).

2 | ### 2.    Additional background

3 | Before jury selection, the State informed the trial court that the parties stipulated

4 | to the admission of polygraph test results:

> [THE STATE]: [B]oth sides have stipulated to the admission of polygraph test results, and the polygraphs were taken. The results are in, and so this Court will have to instruct the jury how they're to use that information pursuant to the Nevada case in this area which is *Corbett*, 94 Nev. 643, 1978 decision. Obviously being here and standing up and telling Your Honor that we're going to want to admit those results, I'm sure you can assume what those results are.
>
> THE COURT: I was proceeding under the assumption that before he took it, the two of you agreed that he could take it and whatever the result was, it would be admitted. And therefore I'm—
>
> [THE STATE]: Yes.
>
> [DEFENSE COUNSEL]: There was a stipulation to that effect.
>
> THE COURT: Okay.

(ECF No. 45-50 at 5–6.)[15]

In opening statements, the State argued the jury would hear the victim "passed her lie detector test," and Cardenas "failed a polygraph test" because the test indicated there was deception when he denied that his mouth and penis touched Sundstrom's vagina. (ECF No. 92-13 at 12-13.) The prosecutor told the jury it was anticipated that the jurors might speculate about the admissibility of polygraph tests. (*Id.*) The prosecutor argued that the judge would instruct the jury on how it could use the polygraph evidence. (*Id.*) Defense counsel argued the evidence would not show Cardenas failed the polygraph test, because, "when you hear the evidence, you'll look at the questions that were posed to him. And in those questions, he admitted just what he told the officers originally regarding the investigation." (*Id.* at 21.)

The polygraph test results for Sundstrom and Cardenas and the recording of Sundstrom's polygraph examination were admitted as evidence at trial without objection.

---

[15]The Court notes that there appears to be no written stipulation signed by Cardenas included in the state court record. (ECF No. 45-50 at 5-6.)

(ECF No. 92-13 at 23; 92-15 at 5.) The polygraph examiner, Clark, testified that because of the techniques he used, "occasionally, you may have an inconclusive polygraphy, but that occurs very seldom." (ECF No. 92-16 at 126.) He said that, "[u]sually, the polygraph is definitive in one way or the other," and claimed, "the switch is either on or off." (*Id.* at 126, 128.) He testified that Cardenas provided "a deceptive polygraph," but it didn't tell Clark what "was going on" inside Cardenas's mind; it only informed Clark that Cardenas wasn't telling the truth when he answered the question. (*Id.* at 128.)

> The trial court instructed the jury about its consideration of the polygraph evidence:
>
> A failed polygraph test result does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination the defendant was not telling the truth. Further, remember that it is for you alone to determine what corroborative weight and effect such test result and testimony relative thereto should be given.

(ECF Nos. 45-60 at 32; 92-17 at 25.) In closing statements, the prosecutor argued the jury had "a CD of both polygraphs," and could listen to those CDs "to check what's been said." (ECF No. 92-17 at 35.) The prosecutor cautioned the jury to "[b]e very careful how you use that evidence of the lie detector test," and argued the jury should use the instruction that the judge gave "[o]n how you can use it and how you can't, what it means and what it doesn't mean," and told the jurors they "need to follow that" and use their common sense. (*Id.* at 34-35.) Defense counsel argued reasonable doubt existed because the case comes down to consent and whom you believe because "there's his story and there's her story, and the truth falls somewhere in between" because Sundstrom was so intoxicated that she did not recall how much she drank that night and Cardenas had about 15 beers. (*Id.* at 111-13.) Defense counsel argued that in such instances, the jury is not locked into disbelieving one witness if they believe the other and they are not "locked" into verbatim testimony of a witness. (*Id.*) In rebuttal, the prosecutor argued, among other things, that Cardenas "flunked his lie detector test; she passed hers." (*Id.* at 119.)

### 3.    State Supreme Court determination

In his initial *pro se* state postconviction petition, Cardenas alleged trial counsel was ineffective because counsel (1) coerced Cardenas into taking a polygraph examination; and (2) failed to move for suppression of Cardenas's polygraph results and post-examination statements and to object to their use at trial. (ECF No. 46-32 at 22.) Cardenas's appointed state postconviction review counsel filed a memorandum of points and authorities in support of the *pro se* petition contending that trial counsel was ineffective by (1) allowing Cardenas to undergo examination by polygraph thereby waiving his *Miranda* rights to remain silent; and (2) stipulating the entire interview and results would be admitted into evidence. (ECF No. 46-58 at 14-15.) The state district court acknowledged Cardenas alleged a claim that trial counsel's "decision to allow [Cardenas] to undergo a polygraph examination and stipulate that the interview and results be admitted into evidence were all 'deficient performance' under *Strickland*," but ruled Cardenas failed to satisfy both prongs of the *Strickland* standard. (ECF No. 47-2 at 4-6.)

The Nevada Supreme Court affirmed the state district court's decision:

> On appeal from the denial of his May 30, 2012, petition, appellant argues that the district court erred in denying some of his claims of ineffective assistance of trial counsel without conducting an evidentiary hearing. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432–33, 688 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown. *Strickland*, 466 U.S. at 697. To warrant an evidentiary hearing, a petitioner must raise claims supported by specific factual allegations that, if true and not repelled by the record, would entitle him to relief. *Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984).
>
> [A]ppellant argues that counsel was ineffective for stipulating to the admission of the interview and test results from polygraph examinations of the victim and appellant. Appellant's claim fails to demonstrate deficiency or prejudice. Appellant fails to cite to authority in support of his claim that the admission of the evidence violated his Fifth Amendment right against self-incrimination. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be addressed by this court."). Moreover, appellant's failure to include complete trial transcripts in his appendix prevents this court from reviewing the district court's

45

1
2

conclusion that appellant failed to demonstrate a reasonable probability of a different outcome at trial but for counsel's alleged deficient performance. We therefore conclude that the district court did not err in denying this claim without an evidentiary hearing.

3     (ECF No. 47-16 at 2-3.)

4                    **4.      Analysis of Ground 4**

5
6

**a.      Ground 4(A) and (B)—Stipulation to polygraph examination and admission of results**

7          The state supreme court applied *Strickland* in determining that counsel's advice to

8     submit to a polygraph examination and stipulation to the admission of the polygraph

9     examinations and results for Cardenas and Sundstrom was not deficient performance.

10    This determination was objectively reasonable.

11         The state court record indicates that before trial Cardenas voluntarily spoke with

12    the sheriff and denied all allegations of sexual contact with Sundstrom. (ECF No. 92-16

13    at 73-77.) The record shows there was no physical evidence or direct eyewitness that

14    supported either guilt or innocence. Under the circumstances, an objectively reasonable

15    trial attorney could predict the outcome of a trial would depend on a credibility contest

16    between Cardenas and Sundstrom. Under Nevada law, Cardenas could be convicted

17    based solely on Sundstrom's uncorroborated testimony if the jury believed her. (ECF No.

18    45-60 at 33.) *See Washington*, 922 P.2d at 551. An objectively reasonable attorney could

19    conclude that if Cardenas testified, his credibility could be impeached by his prior

20    conviction for second-degree murder. (ECF No. 92-15 at 12.)

21         Faced with a questionable prospect of winning a credibility contest at trial, and the

22    possibility that a polygraph examination would support Cardenas's claims of innocence

23    and contradict Sundstrom's claims, an objectively reasonable attorney could, as a matter

24    of strategy, advise Cardenas to submit to the polygraph test, and stipulate to admission

25    of the examinations and results. This is particularly true given that Sundstrom likewise

26    submitted to polygraph examination and the State stipulated to admission of her

27    examination and results. Under these circumstances, a reasonable trial attorney could

28    conclude that the examinations might lead to evidence that would persuade the State to

dismiss the case, resurrect the rescinded plea agreement, or commit to a more favorable plea agreement than was otherwise available. *See, e.g.*, *Sexton v. Cozner*, 679 F.3d 1150, 1160 (9th Cir. 2012) (holding use of state's preferred polygrapher was reasonable strategy as counsel used that polygrapher twice before, counsel accepted defendant's claim of innocence, the charging prosecutor was soon leaving his position, and counsel wished to seize the possibility that the outgoing prosecutor would drop the charges if the examination results were favorable); *Dodson v. Stephens*, 611 F. App'x 168, 175-77 (5th Cir. 2015) (failing to object to testimony about polygraph testing did not constitute ineffective assistance of counsel). The fact that the strategy did not succeed as Cardenas hoped does not mean counsel's advice was, in light of all the circumstances, "outside the wide range of professionally competent assistance." *See Strickland*, 466 U.S. at 690-91. *See also Harrington*, 562 U.S. at 109 (noting strategy that did not work out positively as hoped does not indicate that counsel was incompetent).

Cardenas argues counsel was ineffective based on the Supreme Court opinion in *United States v. Scheffer*, 523 U.S. 303, 305 (1998). (ECF No. 39 at 24; 85 at 20.) In *Scheffer*, the Supreme Court held that Military Rule of Evidence 707, which makes polygraph evidence inadmissible in federal court-martial proceedings, did not unconstitutionally abridge the right of accused members of the military to present a defense. The Supreme Court did not hold polygraph test evidence is always inadmissible; rather, it pointed to conflicting scientific evidence and treatment in various jurisdictions and stated, "[i]ndividual jurisdictions therefore may reasonably reach differing conclusions as to whether polygraph evidence should be admitted." *Scheffer*, 523 U.S. at 312. The decision in *Scheffer* does not assist Cardenas because Nevada is a jurisdiction that permits the admission of polygraph evidence by stipulation, as in this case.

Based on the circumstances, Cardenas fails to establish trial counsel's advice to undergo the polygraph examination and stipulate to admission of the polygraph evidence fell below an objective standard of reasonableness. Thus, he fails to establish the state supreme court's application of *Strickland's* deficiency prong for Grounds 4(A) and (B) is

1    objectively unreasonable. Grounds 4(A) and (B) are therefore denied.

2                    **b.    Grounds 4(C) and (D)—IAC—Failure to object to**
                            **polygrapher's testimony and jury instruction**.
3

4            The claims that trial counsel was ineffective in failing to object to the polygrapher's

5    testimony and failing to object to the jury instruction concerning polygraph evidence were

6    apparently first raised in the operative Petition. (*Compare* ECF No. 39 at 25-27 *with* ECF

7    Nos. 4, 46-32; 46-58; 47-14.) These two claims were also apparently raised during

8    Cardena's second round of state postconviction proceedings and dismissed on state

9    procedural grounds. (ECF Nos. 47-23 at 31-33; 65-7 at 46-48; 65-23.) Respondents

10   assert no procedural defenses to the claims alleged in Grounds 4(C) and (D) in either of

11   their motions to dismiss the Petition or in the portion of their answer in which they address

12   Ground 4. (ECF Nos. 43; 63; 78 at 17-20.)

13           Procedural default is an affirmative defense that Respondents must plead and

14   prove; otherwise the defense is waived. *See Bennett v. Mueller*, 322 F.3d 573, 585 (9th

15   Cir. 2003); *Vang*, 329 F.3d at 1073; *see also Gomez v. Acevedo*, 106 F.3d 192, 197 n.4

16   (7th Cir. 1997) (finding State waived defense even though it stated, in a footnote, that if

17   forthcoming records show petitioner did not exhaust claim, they assert the procedural

18   default defense, as it was not reasonably calculated to alert the court to the defense).

19   While a federal court may sua sponte consider procedural default when its presence is

20   obvious from the face of the petition, it is not required to do so. *See Boyd v. Thompson*,

21   147 F.3d 1124, 1228 (9th Cir. 1998); *Vang*, 329 F.3d at 1073 (distinguishing

22   circumstances when a court may sua sponte consider procedural default from

23   circumstances when the court should consider the defense waived). *See also Day v.*

24   *McDonough*, 547 U.S. 198, 209 (2006) (holding that "district courts are permitted, but not

25   obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition" and

26   noting a statute-of-limitations defense "must be treated the same" as a procedural-

27   defense). Because any default is not clear from the face of the Petition, the Court will

28   address these claims in Ground 4 on the merits. *See Smith v. Ryan*, 823 F.3d 1270, 1285

1

(9th Cir. 2016).

2       Cardenas has not established that trial counsel's performance in failing to object

3   to Officer Clark's testimony and the jury instructions on polygraph evidence was either

4   deficient or prejudicial under *Strickland*. First, it was futile for trial counsel to object to

5   Clark's testimony about the reliability of a polygraph because, in this instance, Cardenas's

6   testimony proved the polygraph was reliable. Clark testified that, although Cardenas was

7   adamant that he had no sexual contact with Sundstrom, the polygraphy indicated

8   Cardenas's responses were "deceptive." (ECF No. 92-16 at 125-27.) Both Clark and

9   Cardenas testified that Cardenas changed his story and confessed that he had sexual

10  contact with Sundstrom, after Clark disclosed the result to Cardenas. (ECF No. 92-16 at

11  75-83, 125-27.) Cardenas' own testimony proved the reliability of the polygraph result that

12  he was deceptive because he testified that he lied during the polygraph examination.

13  Second, it was futile to object to the jury instruction regarding the polygraph evidence

14  because it was approved by the Nevada Supreme Court as a matter of state law. *See*

15  *Corbett*, 584 P.2d at 705. Thus, there was no reasonable probability trial counsel would

16  have succeeded with an objection to the instruction's characterization of polygraph

17  examination results. Because Cardenas fails to demonstrate either deficient performance

18  or prejudice, as required by *Strickland*, the allegations in Grounds 4(C) and (D) lack merit

19  and are denied.

20       **E.    Ground 5—IAC and Evidence that Cardenas Fled to Avoid Trial**

21       Cardenas alleges trial counsel rendered ineffective assistance by stipulating to the

22  admission of evidence that Cardenas failed to appear for his initially scheduled trial date.

23  (ECF No. 39 at 28-29.) He alleges he was prejudiced by counsel's stipulation because it

24  allowed the State to present evidence and a jury instruction, supporting its argument that

25  Cardenas fled due to consciousness of guilt. (*Id.*) He claims the evidence was

26  inadmissible to show flight because he did not flee "immediately" after the crime or after

27  he was accused of the crime. (*Id.*) Respondents contend that the Nevada Supreme Court

28  rejected Cardenas's challenge to the propriety of the flight instruction on direct appeal

and that the Nevada Supreme Court's application of *Strickland* was objectively reasonable. (ECF No. 78 at 20-23.) The state supreme court reasonably applied *Strickland's* prejudice prong to this claim.

### 1.    Applicable legal principles

"Relevant evidence is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence'" and is generally admissible. *Chavez v. State*, 213 P.3d 476, 487 (Nev. 2009) (citing NRS § 48.015; NRS § 48.025). Relevant evidence is inadmissible 'if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.'" *Id.* (citing NRS § 48.035(1)).

"A presumption of inadmissibility attaches to all prior bad act evidence" and to overcome the presumption, the prosecutor must request a hearing and establish that "(1) the [prior bad act] is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Rosky v. State*, 111 P.3d 690, 697 n.37 (Nev. 2005).

"[U]nder Nevada law, a district court may properly give a flight instruction if the State presents evidence of flight and the record supports the conclusion that the defendant fled with consciousness of guilt and to evade arrest." *Rosky*, 111 P.3d at 699-700 (finding trial court's flight instruction was not an abuse of discretion because evidence showing defendant fled to Mexico, considered assuming a different identity, and planned to abscond to Brazil where he could not be extradited, was sufficient for a jury to infer that defendant's failure to appear in court demonstrated consciousness of guilt). *See also Hutchins v. State*, 867 P.2d 1136, 1142-43 (Nev. 1994) (finding evidence supported flight instruction, even though defendant claimed he had not fled, but merely left the scene of the crime, where a witness testified defendant called her three times in the early morning hours following the incident stating he was "scared," and had not sought medical attention

for an injured leg); *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1106-07 (9th Cir. 1979) (holding flight instruction appropriate where defendant knew about the charges against him, had been arrested, arraigned, and pled not guilty, and fled a few days before his scheduled jury trial, and explaining that the requirement that the defendant fled immediately after the crime is only important if the defendant does not know, or his knowledge is doubtful, about the charges and accusations made against him).

### 2.    Additional background

Before jury selection, trial counsel objected to the State's proposed instruction on flight. (ECF No. 45-50 at 6-7.) Counsel argued that *United States v. Feldman*, 788 F.2d 544 (9th Cir. 1986), and *United States v. Sanchez*, 790 F.2d 245 (2d Cir. 1986), supported the defense position that a flight instruction is error if it is based on the mere nonappearance of a defendant at trial. (*Id.*) The State argued Cardenas was on notice that the relevant witnesses from out of state would be called to testify concerning flight and yet the defense did not file a motion to preclude the State from presenting that testimony. (*Id.* at 9-10.) The State wished to explain in opening statements the reasons for the delay between the crime in 2007 and the trial in 2011. (*Id.* at 10-11.) The State also wished to present the evidence that Cardenas fled the jurisdiction to support an instruction and argument that the jury consider his flight as motivated by consciousness of guilt. (*Id.* at 151-52.) The State proffered facts to support the admission of the evidence and the flight instruction so that the State could mention it during the forthcoming opening remarks:

> Court issues a warrant for his arrest. Some almost six months later, February 6th, 2010, a year ago, the defendant is in Washington State living with his girlfriend . . . Washington authorities are given information relative to his location by the bail bond company who doesn't like the fact that they're about to get stuck.
>
> They pass that information on to police authority in Spokane. They knock on the door. The girlfriend lies, "Joel is not here."
>
> "Mind if we look around?"
>
> "Absolutely not." They start looking around, hear some rustling upstairs. To make a long story short, Your Honor, this isn't an incident where, gee, the defendant missed his court date and got stopped for speeding and they

51

1

2

3

4

> found out there was a warrant for his arrest.
>
> The defendant jumped out of a second-story window into his neighbor's boat. "Police. Stop!" He flees the scene, runs down the street. They track him with a K-9, and I've got the photographs of his buttocks and leg because he had to be dragged out by the K-9. This is flight, and the State should be allowed to use it.

5

6

7

(*Id.* at 153-54.) The trial court responded that there appears to "be more than enough scintilla of evidence that there was flight involved to avoid this trial" because Cardenas "jumped out of the window and ran away from the cops." (*Id.*)

8

9

10

11

12

13

14

15

Defense counsel argued that, according to the Second Circuit Court of Appeals in *Sanchez*, 790 F.2d at 252, the nonappearance of the defendant for trial must be accompanied by other facts to support the instruction, and the flight instruction is valid only if there's evidence sufficient to support an "unbroken inference from the defendant's behavior to the defendant's guilt of the crime charged." (*Id.* at 155-56.) The trial court agreed that one must look at the totality of the circumstances, and ruled the proffered evidence showed Cardenas's absence was not merely nonappearance versus a flight. (*Id.* at 157-59.)

16

17

18

19

20

21

22

23

24

The trial court stated the defense could present evidence that there was a reason why Cardenas fled that had nothing to do with avoiding trial. (*Id.*) Defense counsel stated, "Well, the only thing I would offer, he's not a resident of Pahrump. He's a resident of where he was located ultimately." (*Id.*) The trial court asked if the parties wished to hold a *Petrocelli* hearing to "make a determination whether [the State ] met . . . clear and convincing that in fact he jumped out of a window, got bit by dogs, [and] cops were chasing him." (*Id.* at 158-59.) Defense counsel stipulated to the factual scenario the State prosecutor had" laid out" and stated, "I'll submit it on the argument. I'll stipulate." (*Id.*) The trial court ruled that the stipulated facts supported a flight instruction. (*Id.*)

25

26

27

28

In opening statements, the prosecutor argued the jury would hear testimony that Cardenas failed to appear for his initially scheduled trial date, and police later found him in Spokane, Washington, where he jumped from a second-story window and was apprehended after contact with a K-9. (ECF No. 92-13 at 8-10.) The prosecutor argued

1 the jury would be instructed that it could infer consciousness of guilt from those

2 circumstances, but also stated the jury could decide it was explainable because he was

3 "just scared," and urged the jury would decide what weight "if any" to give to flight from

4 prosecution. (*Id.*) Defense counsel argued the evidence would show Cardenas was not

5 from Nevada; he was from Washington. (*Id.* at 20.)

6       Certified copies of the court minutes and transcript of proceedings reflecting

7 Cardenas failed to appear for trial on the sexual assault charge on July 8, 2009, were

8 admitted at trial without objection. (ECF No. 92-13 at 22-23.) Three officers of the

9 Spokane Police Department testified Cardenas was arrested under a Nevada warrant at

10 a residence in Spokane, Washington on February 6, 2010. (*Id.* at 22-39.) While awaiting

11 backup officers, one officer heard male and female voices inside the residence. (*Id.* at

12 39.) After two additional officers arrived, the officers contacted a female who was inside

13 the residence. (*Id.* at 38.) She claimed there was no male there but consented to a search.

14 (*Id.* at 25-26.) While searching, an officer heard a "loud commotion," went outside, and

15 saw Cardenas jump out of a second-story window and run away. (*Id.* at 26.) The officer

16 chased him but lost sight of him until their K-9-unit dogs found Cardenas hiding on a back

17 porch. (*Id.* at 26-33.)

18       At the close of the evidence, the trial court read an instruction addressing the jury's

19 use of the evidence concerning flight:

20      The flight of a person immediately after the commission of a crime or after
     he is accused of a crime that has been committed is not sufficient in of itself

21      to establish his guilt, but is a fact which, if proved, may be considered by
     you in the light of all the other proved facts in deciding the question of his

22      guilt or innocence. Whether or not evidence of flight shows a consciousness
     of guilt and the significance to be attached to such a circumstance are

23      matters for your deliberation.

24 (ECF Nos. 45-60 at 29; 92-17 at 24.) In closing, the State argued the instructions told the

25 jury how it could legally use Cardenas's flight to establish guilt. (ECF No. 92-17 at 29-31.)

26        **3.**    **State court determinations**

27       On direct appeal, the Nevada Supreme Court rejected Cardenas's challenge to the

28 flight instruction:

> [C]ardenas argues that the district court erred in giving a flight instruction based on his failure to appear at his first scheduled trial almost seven months after the alleged offense occurred. "[U]nder Nevada law, a district court may properly give a flight instruction if the State presents evidence of flight and the record supports the conclusion that the defendant fled with consciousness of guilt and to evade arrest." *Rosky v. State*, 121 Nev. 184, 199, 111 P.3d 690, 699–700 (2005). Here, the defense stipulated that six months after Cardenas failed to appear at his first scheduled trial, police officers located him living at a residence in the state of Washington. When the police went to the residence to arrest him on his outstanding warrant for sexual assault, Cardenas jumped out of the second-story window, ran away from the police, and had to be subdued by a police canine. We conclude that this evidence supported an inference that he fled due to a consciousness of guilt and to avoid prosecution. *See id.*; *see also United States v. Hernandez-Miranda*, 601 F.2d 1104, 1107 (9th Cir. 1979) ("Flight immediately after the commission of a crime, or immediately prior to trial, both support an inference of consciousness of guilt."). Thus, the district court committed no error in its flight instruction to the jury.

(ECF No. 46-23 at 5.) In postconviction review proceedings, the Nevada Supreme Court found trial counsel's stipulation to the admission of the evidence of flight was not ineffective:

> [A]ppellant argues that counsel was ineffective for stipulating to the admission of evidence proving that appellant fled the jurisdiction to avoid trial. Appellate fails to demonstrate deficiency or prejudice. Appellant neither disputes his flight nor alleges that the State might not have proven it absent the stipulation. Appellant thus fails to demonstrate a reasonable probability of a different outcome absent the stipulation. We therefore conclude that the district court did not err in denying this claim without an evidentiary hearing.

(ECF No. 47-16 at 3-4.)

### 4.    Analysis of Ground 5

The Nevada Supreme Court's application of *Strickland*'s prejudice prong is objectively reasonable. There is no reasonable probability the evidence of flight and corresponding flight instruction would not have been submitted to the jury but for counsel's stipulation as, under Nevada state law, the proffered facts sufficed for the evidence of flight and for the flight instruction to go to the jury so it could decide whether the flight evidence warranted an inference of guilt. *See Hutchins*, 867 P.2d at 1142-43. *See also Hernandez-Miranda*, 601 F.2d at 1106. Cardenas's argument that the State was relieved of its burden of proof by virtue of the flight instruction because the jury could find Cardenas guilty solely because of flight is without merit. (ECF No. 39 at 29.) The

1   instruction directed the jury that evidence of flight "is not sufficient in of itself to establish
2   his guilt, but is a fact which, if proved, may be considered by you in the light of all the
3   other proved facts in deciding the question of his guilt or innocence." (ECF Nos. 45-60 at
4   29;  92-17  at  24.)  It  is  presumed  that  juries  follow  instructions.  *See*
5   *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200,
6   211 (1987)). Accordingly, Ground 5 is denied.

7        **F.**    **Ground 7—Juror Misconduct**

8        Cardenas alleges the trial court violated his right to a fair and impartial jury
9   guaranteed by the Sixth and Fourteenth Amendments when it denied his motion for
10   mistrial after a trial court visitor asked Juror 11 about jury nullification and called Juror 11
11   "ignorant." (ECF Nos. 39 at 32-33; 85 at 29-30.) He contends the contact with the juror
12   was presumptively prejudicial under *Remmer v. United States*, 347 U.S. 227, 229 (1954),
13   the State failed to overcome that presumption, and there was a reasonable probability the
14   extraneous communication influenced the jury's decision. (*Id.*) Cardenas alleges the
15   communication was prejudicial because the court visitor's insult toward Juror 11 for failing
16   to understand jury nullification tends to prejudice the juror against the defense because
17   jury nullification is a "defense-friendly concept," and other jurors were aware that
18   something had occurred, including one juror who heard the communication. (ECF No. 85
19   at 30.) Respondents contend the Nevada Supreme Court's rejection of this claim was
20   objectively reasonable as none of the jurors who were exposed to the communication
21   stated that it negatively impacted them or would affect their ability to deliberate and
22   consider only the evidence before them in reaching a verdict. (ECF No. 78 at 23-25.) For
23   the reasons discussed below, the state supreme court's determination is neither contrary
24   to nor constitutes an unreasonable application of clearly established federal law as
25   determined by the Supreme Court and is not based on an unreasonable determination of
26   fact in light of the evidence presented in the state court proceedings.

27             **1.**    **Additional background**
28        After the State delivered its closing remarks, the parties became aware that an

unrelated courthouse visitor, later identified as Dean Brooks, had communicated with Juror 11 in the presence of Juror 2.[16] (ECF No. 92-17 at 68-78.) At defense counsel's suggestion, the trial court examined Juror 11 about the encounter:

> THE COURT: [J]uror No. 11], my bailiff just approached me and told me of an incident that might have occurred out in the hallway with you. Did something out of the ordinary occur?
>
> JUROR NO. 11: Yes. I was smoking with one of the other bailiffs [sic]. His name is Ray. I don't know his last name. He was right next to me. And a gentleman was coming in, and he said to me, he said, "Are you on the jury?" I didn't look at him. I didn't say anything. And he said, "Do you know about this?" And I said, "I said I can't discuss anything." He said, "That's why there's a lot of ignorance around." And that was the end of it. I walked away. And I pointed the gentleman out to the bailiff.
>
> . . . .
>
> THE COURT: [Y]ou began by saying the gentleman said something to you along the lines of, "Do you know anything about this?"
>
> JUROR NO. 11: [H]e was asking me a question which I couldn't understand. I said, "I can't discuss anything with you at all." And Ray was alongside of me, the other juror was around, and he said, "That's why there's a lot of ignorance around," and walked away. And I just went back inside and told the bailiff. That's it.

(*Id.* at 75-76.) Juror 11 did not discuss the details with other jurors; however, Juror No. 2 (Ray) was present. (*Id.* at 82.) Juror 11 confirmed the conversation would not cause him to favor or disfavor either side or impact his ability to fairly weigh the evidence. (*Id.* at 76.)

Juror 2 saw Brooks approach Juror 11, and heard him tell Juror 11, "I see you wearing a juror badge" and ask a question about jury nullification, but heard Juror 11 reply, "I would rather not talk about it. I'm not allowed to talk about anything." (ECF No. 92-17 at 86.) Juror 2 said Brooks replied, "Well, it's not about the case," but Juror 11 replied, "I still can't talk about it. Nothing to do with it." (*Id.*) Juror 2 said Brooks walked away and said," That's what ignorance is all about." (*Id.* at 86-87.) Juror 2 had no conversation with Brooks. (*Id.*) Juror 2 said, "Well, I thought what [Juror 11] said was

---

[16]It was originally reported that a police officer, who was a witness in the case, spoke with Juror 11, but that turned out to be incorrect. Juror 11 instead identified a courthouse visitor as the person involved in the communication. (ECF No. 45-62 at 68-78; 106-07.)

right. I mean I would have proceeded to say the same thing. But I didn't like the attitude he took when he said ignorant," and Juror 2 considered that an insult to Juror 11. (*Id.*) Juror 2 said the other jurors "kind of quizzed" them about it when they returned to the jury room, but he and Juror 11 told them, "No. We would rather not talk about it," and they didn't talk about it. (*Id.* at 87-88.) Juror 2 said the encounter would not influence his deliberations and he could still be fair to both sides. (*Id.*)

Brooks testified he was at the courthouse to file a report on an unrelated matter and was outside the courthouse talking to someone. (ECF No. 92-17 at 80, 104-05.) He admitted he asked Juror 11 whether he was "aware of jury nullification." (*Id.* at 80.) Brooks said the juror replied, "I can't talk about it," and Brooks retorted, "Yeah. That's why there's such and such trouble, total ignorance." (*Id.* at 80-81.) Brooks said nothing more because he "saw where [the juror] was at," and Brooks just walked away. (*Id.* at 81, 105-06.)

At defense counsel's request, the trial court examined the remaining eight jurors and two alternates. (ECF No. 92-17 at 89-102.) Each stated they did not witness the incident, and they either had no idea that anything occurred or were aware something had happened but did not know any details and there was no discussion in the jury room about it. (*Id.*) Two jurors stated that Juror 11 appeared "upset" and other jurors said that Jurors 2 and 11 simply stated something happened and they must talk to the bailiff. (*Id.*)

The defense moved for mistrial, and the trial court denied the motion finding no presumptively prejudicial incident had occurred and there was no prejudice to either side:

> [DEFENSE COUNSEL]: [S]ince we've been conducting this inquiry, I've been keeping score amongst the jurors. There are two jurors who heard the statement regarding juror nullification and ignorance. There are five other jurors who know that something took place between one of their fellow jurors and someone else. At this point in time, I would move the Court for a mistrial, and I would ask the Court to hear me out.
>
> . . . .
>
> [T]he Defense and the Prosecution are entitled to an impartial jury free from extrajudicial influence and contact. Any private communications with a juror during the trial or about pending matters are deemed to be presumptively prejudicial.
>
> The Prosecution has a heavy burden to establish that such contact was

harmless, and I would cite the case of *Remmer* . . . versus, United States 227, page 229. "Due process requires a jury capable and willing to decide the case on the merits. If there are improper contacts, due process cannot be done."

And on Mr. Cardenas' behalf, I would move the Court for a mistrial based upon what has just happened.

THE COURT: Thank you, sir. [THE STATE]?

[THE STATE]: [I] have nothing to add to what was patently, obviously a nonissue.

THE COURT: I believe in that Supreme Court case, without having read it, that when they talk about contacts with jurors, that it involves more merit than merely a citizen approaching them and talking about anything as has been done in this case.

. . . .

I appreciate you making a record on your motion for mistrial. It's denied. There was no presumptively prejudicial incident that occurred here. There's no prejudice to either side. The Court will instruct the jurors when they come back, and I'm sure that once they hear . . . that there was nothing improper done by either side, that there won't be any prejudice.

(*Id.* at 102-04.) The trial court explained to the jury that the parties did nothing improper:

THE COURT: [A]n incident occurred with a couple of jurors. They were approached by a citizen . . . outside somewhere. We don't have any control over that. We can't tell every citizen in the world, ["]Don't walk up and talk to jurors.["]

Nothing improper was done by anyone who is connected with this case—neither the Defense, the State, the defendant—nobody did anything wrong at all. And in fact, that was the final conclusion. Nothing was done for the purpose of this trial that was improper. And so hopefully you can continue to listen to the argument this afternoon and proceed to deliberate fairly and so forth.

(*Id.* at 108.) The trial court had earlier instructed the jury: "[a]nything you may have seen or heard outside the courtroom is not evidence" and must be disregarded. (*Id.* at 18.)

## 2.      Applicable legal principles

The Sixth Amendment guarantees the right to a trial "by an impartial jury." *See Duncan v. State of La.*, 391 U.S. 145 (1968) (incorporating the Sixth Amendment right to trial by jury into the due-process clause of the Fourteenth Amendment). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation," but it does require "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial

occurrences and to determine the effect of such occurrences when they happen." *Smith*, 455 U.S. at 217. Trial courts have discretion to conduct a hearing of alleged jury misconduct and to determine the extent and nature of any misconduct. *See Remmer v. United States*, 347 U.S. 227, 229-30; *Smith*, 455 U.S. at 217 ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.").

In *Mattox v. United States*, 146 U.S. 140, 142 (1892), the Supreme Court overturned a murder conviction on Sixth Amendment grounds in part because the bailiff had told the jury during deliberations that "this is the third fellow [the defendant] has killed." The Supreme Court in *Mattox* announced that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150. The Supreme Court later recognized that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury" is "presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Remmer*, 347 U.S. at 229. *See also, e.g.*, *Caliendo v. Warden of California Men's Colony*, 365 F.3d 691 (9th Cir. 2004) (granting new trial where state appellate court's determination that petitioner was not prejudiced by 20-minute conversation on non-trial topics between three jurors and key prosecution witness, who was a police officer, was contrary to Supreme Court precedent); *United States v. Brande*, 329 F.3d 1173, 1175-77 (9th Cir. 2003) (remanding for evidentiary hearing to determine whether ex parte contact between juror and court officer, in which officer questioned juror's ability to find defendants guilty of a crime based on his religious beliefs, violated defendant's right to impartial jury because the juror's susceptibility to improper influence was heightened by the involvement of a court officer, and there was no opportunity to address the contact because it came to light after trial). ///

1    In Nevada, a defendant is not entitled to a new trial based on allegations of juror

2    misconduct unless it is shown that juror misconduct (1) occurred and (2) prejudiced the

3    defendant. *See Meyer v. State*, 80 P.3d 447, 455 (Nev. 2003). In egregious cases, such

4    as "[d]irect third-party communications with a sitting juror relating to an element of the

5    crime charged or exposure to significant extraneous information concerning the

6    defendant or the charged crime," prejudice is conclusively presumed without the

7    defendant's having to show prejudice; in non-egregious cases, the defendant has the

8    burden to show prejudice. *Id.* at 455-456. To show prejudice, it must be shown "there is

9    a reasonable probability or likelihood that the juror misconduct affected the verdict." *Id.*

10   The Nevada Supreme Court defines a reasonable probability as a "probability sufficient

11   to undermine confidence in the outcome." *Lobato v. State*, 96 P.3d 765, 772 (Nev. 2004)

12   (quoting *Strickland*, 466 U.S. at 694). The Ninth Circuit Court of Appeals has held that

13   Nevada's test to evaluate juror misconduct is neither contrary to nor constitutes an

14   unreasonable application of clearly established federal law as determined by the

15   Supreme Court. *See Von Tobel v. Benedetti*, 975 F.3d 849, 851 (9th Cir. 2020).

16              **3.    State court's determination**

17   On direct appeal, the Nevada Supreme Court concluded Cardenas failed to show

18   the communication to the juror had a reasonable probability or likelihood of affecting the

19   jury's verdict:

20       [C]ardenas argues that the district court erred in denying his motion for
21       mistrial based on juror misconduct. During closing arguments, the district
         court was alerted that a juror communicated with an individual outside of
22       the courtroom. The district court held a hearing, at which it was determined
         that a courtroom spectator had approached the juror, asked him a question
23       about jury nullification, and when the juror refused to talk to him, the
         spectator made a comment about ignorance. Based on the limited record
24       provided for our review, we conclude that Cardenas has failed to show that
         this communication had a reasonable probability or likelihood of affecting
25       the jury's verdict.

26           [FN 3] We again note that Cardenas failed to provide the
             entire transcript relating to this issue, including the district
27           court's factual findings and ruling on his motion for mistrial.
             Thus, our review is based on the incomplete record before us.

28   *See Meyer v. State*, 119 Nev. 554, 563, 80 P.3d 447, 455 (2003) (the
     defendant must establish that juror misconduct occurred and that it was

prejudicial in order to prevail on a motion for mistrial). As for Cardenas's argument that there was a presumption of prejudice, we have firmly rejected "the position that any extrinsic influence is automatically prejudicial." *See id.* at 564, 80 P.3d at 455 (the district courts must "examine the nature of the extrinsic influence in determining whether such influence is presumptively prejudicial"); *see also Lamb v. State*, 127 Nev.___, ___, 251 P.3d 700, 712 (2011) (explaining that *Meyer* substantially limited the presumed-prejudice rule). Thus, Cardenas has failed to demonstrate that the district court abused its discretion in denying his motion for mistrial.

(ECF No. 46-23 at 6-7.)

### 4.    Analysis of Ground 7

The state supreme court's determination that the communication held no reasonable probability or likelihood of affecting the verdict is objectively reasonable. It is reasonable to conclude prejudice is not presumed because nothing about the nature of the communication with the two jurors concerned the matter pending before the court by relating an element of the crime charged or exposure to significant extraneous information concerning the defendant or the charged crime. *See Remmer*, 347 U.S. at 229; *Meyer*, 80 P.3d 447, 455-56. Although the court visitor mentioned the concept of "jury nullification," the trial judge instructed the jurors they must disregard anything that they see or hear outside the courtroom because it is not evidence, (ECF No. 92-17 at 18), and juries presumably follow instructions. *See Weeks*, 528 U.S. at 234 (citing *Richardson*, 481 U.S. at 211). Juror 11 testified that nothing about the communication would cause him to favor or disfavor either side or impact his ability to fairly weigh the evidence. (*Id.* at 76.) Juror 2 likewise testified his witnessing the communication would not influence his deliberations and he could still be fair to both sides. (*Id.* at 87-88.) The remaining jurors and alternates either knew nothing about the communication or were aware that something had occurred outside the jury room, including two jurors who noticed Juror 11 appeared "upset," when he returned to the jury room, but none of the other jurors knew any of the details. (*Id.* at 89-102.) The trial court ultimately advised the jurors that a citizen had approached a couple of the jurors, but nothing improper was done by anyone connected with the case and instructed the jurors that neither party was at fault for the communication. (*Id.* at 108.) Under the circumstances, the state supreme court could

reasonably determine there is no reasonable probability the communication likely affected the outcome or undermines confidence in the outcome. Cardenas is not entitled to federal habeas relief for Ground 7.

## V.    Consideration of Counsel's Conduct as a Whole

The Court notes that, although IAC claims are examined separately to determine whether counsel was deficient, *Strickland* instructs that the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." The performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances.*" *Strickland*, 466 U.S. at 688 (emphasis added). *See also Boyde*, 404 F.3d at 1176 ("prejudice may result from the cumulative impact of multiple deficiencies.") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)). In *Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017), the Ninth Circuit Court of Appeals held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct as a whole to determine whether it was constitutionally adequate." *Id.*

On consideration of the merits of Cardenas's IAC claims as a whole, and assuming he could overcome the procedural defaults of some of these IAC claims, the Court concludes that Cardenas does not show that, on the whole, apart from the claim in Ground 2, trial counsel's actions or omissions were deficient and prejudicial. Accordingly, the Court further finds that, apart from Ground 2, Cardenas does not demonstrate that he received constitutionally inadequate assistance from counsel denying him due process or a fair trial.

## VI.    MOTION TO SEAL EXHIBIT

Respondents filed a motion to seal (ECF No. 91) the document filed as Exhibit 12-4, and they filed a redacted version of the exhibit filed as ECF No. 12-4 (ECF No. 92-3). Compelling reasons exist to seal the document filed as Exhibit 12-4 because it contains

personal-data identifiers, and parties cannot change filings. *See* LR IC 6-1(a)(5) ("If a home address must be included, only the city and state should be listed."). Accordingly, the motion to seal is granted.

## VII.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Cardenas. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," and for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether this Court's procedural ruling was correct. *See id*. Applying this standard, a certificate of appealability is warranted for Grounds 1 and 4 of the Petition because reasonable jurists could debate whether the Petition states valid claims of the denial of a constitutional right and whether this Court's procedural ruling is correct. A certificate of appealability is not warranted for any other grounds in the petition. *See Slack*, 529 U.S. at 484.

## VIII.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that the amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 39) is conditionally granted as to Ground 2 and denied as to the remaining grounds. The state court's judgment of conviction of Petitioner Joel

Cardenas in Case No. CR 5364 in the Fifth Judicial District Court of Nevada is hereby vacated.  Within 30 days of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, unless the State files a written election in this matter within the 30-day period to retry Cardenas and thereafter commences jury selection in the retrial within 120 days following the election to retry Cardenas, subject to reasonable request for modification of the time periods in the judgment by either party pursuant to Rules 59 and 60.

It is further ordered that Cardenas's Motion for Evidentiary Hearing (ECF No. 87) is denied.

It is further ordered that the Motion to Have Clerk Seal Previously Filed Document (ECF No. 91) is granted.

It is further ordered that a certificate of appealability is granted for Grounds 1 and 4 of the Petition and a certificate of appealability is denied for all other grounds of the Petition.

The Clerk of Court is further directed to (1) seal the document filed as ECF No. 12-4; (2) enter judgment accordingly; (3) provide a copy of this order and the judgment to the Clerk of the Fifth Judicial District Court of Nevada in connection with that court's case number CR 5364; and (4) close this case.

DATED THIS 2nd Day of July 2024.

_____

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE